**HORNELL BREWING CO., INC. and Don Vultaggio, Plaintiffs,**

v.

**Nicholas BRADY, as United States Secretary for the Department of the Treasury; the United States Department of the Treasury; Stephen E. Higgins, as Director of the Bureau of Alcohol, Tobacco & Firearms; and William T. Earle, as Chief, Industry Compliance Division for the Bureau of Alcohol, Tobacco & Firearms, Defendants.**

No. CV 92–5720 (CBA).

United States District Court,
E.D. New York.

April 7, 1993.

McDermott, Will & Emery by Lawrence I. Fox, Russell G. Tisman, New York City, and T. Raymond Williams, Nathalie F.P. Gilfoyle, Washington, DC, for plaintiffs.

Stuart M. Gerson, Asst. U.S. Atty. Gen.

Mary Jo White, U.S. Atty., E.D. New York, Brooklyn, NY by Igou Allbray, Asst. U.S. Atty.

Peter S. Modlin, Patricia M. Russotto, Sandra M. Schraiman, Dept. of Justice, Civil Div., Washington, DC, Imelda Koett, Jeanette Slattery, Office of Chief Counsel, Bureau of Alcohol, Tobacco & Firearms, of counsel, for defendants.

## ORDER

AMON, District Judge.

This Court has received the Report and Recommendation of United States Magistrate Judge Joan M. Azrack on the parties' cross motions for summary judgment in the above-captioned case. After an exhaustive analysis of the complex issues raised by these motions, Magistrate Judge Azrack recommended granting summary judgment to the plaintiffs on their claim that Public Law 102–393, § 633 was an unconstitutional infringement of rights guaranteed by the First Amendment. The Magistrate Judge rejected plaintiffs' additional contentions that the statute violated plaintiffs' rights under the Fifth Amendment, constituted a bill of attainder in violation of Article I, § 9 of the Constitution, and violated the principles of separation of powers as delineated in Articles I, II and III of the Constitution.

■  Having received objections to the report, this Court has conducted an extensive *de novo* review of the entire record of the proceedings, considered the objections raised and heard oral argument. The Court hereby adopts the Report and Recommendation of the Magistrate Judge insofar as it concludes that the government has failed to satisfy the test to regulate commercial speech as set forth in *Central Hudson Gas & Electric v. Public Service Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).[1]

■  The Court further notes that, subsequent to issuance of Magistrate Judge Azrack's report, the Supreme Court, in *Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), held that the City of Cincinnati's refusal to allow the distribution of commercial publica-

---

1.  Plaintiffs have raised a substantial argument that a strict scrutiny analysis should be employed under *R.A.V. v. St. Paul,* —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) because Public Law 102–393, § 633 is a content-based restric-  tion of commercial speech. It is not necessary to address that issue in view of the Court's concurrence in the Magistrate Judge's conclusion that the government has not met the less stringent test set forth in *Central Hudson.*

tions through freestanding newsracks violated the First Amendment. The Court there determined that Cincinnati had not satisfied its burden of establishing a reasonable fit between this outright ban on such newsracks and the city's legitimate interest in ensuring safe streets and regulating visual blight. *Id.,* —— U.S. at ——, 113 S.Ct. at 1510. Cincinnati's failure "to address its recently developed concern about newsracks by regulating their size, shape, appearance, or number indicates that it has not 'carefully calculated' the costs and benefits associated with the burden on speech imposed by its prohibition." *Id.* Likewise, here no attempt was made to consider alternative measures that were more narrowly tailored to the government's interest, short of a complete ban on use of the Crazy Horse label.

The *Cincinnati* Court also found that the requisite "fit" was absent because the benefit achieved by the prohibition, the removal of 62 newsracks "while about 1,500 to 2,000 remain in place," *id.,* was "'minute'" and "'paltry.'" *Id.* Here, Public Law 102–393, § 633 prohibits the use of just a single name, Crazy Horse, on a label. All other potentially appealing names of revered and important Native American icons, such as Sitting Bull and Big Foot, or any other names or symbols that might appeal to Native Americans, are permitted to appear on alcohol labels. For these reasons and the reasons stated in Magistrate Judge Azrack's report, defendants have not met their burden under *Central Hudson.* Accordingly, plaintiffs' motion for summary judgment is granted.

Because the First Amendment prohibits enforcement of Public Law 102–393, § 633, the Court finds that it is unnecessary to address or adopt that portion of Magistrate Judge Azrack's report which deals with the remaining constitutional principles that plaintiffs contend invalidate the law.

The clerk of the court is directed to enter judgment accordingly.

SO ORDERED.

AZRACK, United States Magistrate Judge.

This action was brought by plaintiffs to challenge on six grounds the constitutionality of Public Law 102–393, § 633 and to seek a permanent injunction prohibiting defendants from revoking the existing Certificates of Label Approval (COLAs) for Crazy Horse Malt Liquor, and preventing them from denying pending and subsequently filed applications for COLAs pertaining to Crazy Horse Malt Liquor. Upon initiating the action, plaintiffs moved before the Honorable Carol Bagley Amon, United States District Judge, for a preliminary injunction. On December 22, 1992, the parties stipulated that the motion would be recast as a summary judgment motion, permitting time for response and cross motion by defendants. (*See* Stipulation at 1, 2.) Judge Amon referred the motions in their entirety to the undersigned for a Report and Recommendation. The matter was fully briefed and oral argument was heard on January 27, 1993. For the reasons set forth below, the undersigned respectfully recommends that summary judgment be granted in favor of plaintiffs on the First Amendment claim, and in favor of defendants on the five remaining claims.

### BACKGROUND AND FACTS

The following facts are undisputed unless otherwise indicated. Plaintiff Hornell Brewing Company ("Hornell") is a New York corporation which maintains its principal place of business in Brooklyn, New York and produces and markets alcoholic and non-alcoholic beverages including "The Original Crazy Horse Malt Liquor" ("Crazy Horse"). Plaintiff Don Vultaggio is Chairman and co-owner of Hornell. In February, 1992, the Bureau of Alcohol, Tobacco and Firearms ("BATF") issued a Certificate of Label Approval ("COLA") to Hornell's bottler, G. Heileman Brewing Company ("GHBC"), authorizing the bottling and distribution of the Crazy Horse product.[1] The certification process of BATF includes the consideration of whether the label is misleading, fraudulent, or obscene. Hornell introduced Crazy Horse in fourteen states in March 1992. To date,

---

1. BATF regulations set forth that the COLA is      issued to the bottler of the product.

Crazy Horse is distributed in thirty-one states through over 200 wholesalers who resell to over 100,000 retailers. Hornell claims that Crazy Horse Malt Liquor was to be the first product in a series of Hornell beverages that celebrate the American West.[2]

The introduction of the product caused a surge of indignation throughout Congress, seemingly initiated by the United States Surgeon General Antonia Novello. In April 1992, Dr. Novello held a press conference in Rapid City, South Dakota, where she criticized the choice of the name Crazy Horse for a malt liquor. She accused Hornell of "insensitive and malicious marketing" and encouraged the leaders of Indian nations to use public outrage to force Crazy Horse off the market. (Speech given in Rapid City, South Dakota, April 22, 1992, attached to Vultaggio Aff. as Ex. 5.) Subsequently, members of Congress joined the effort to prohibit use of the name Crazy Horse on the malt liquor product. By letter dated April 20, 1992, South Dakota Senator Larry Pressler directed Hornell to change the product's name or donate its proceeds to Native American causes because "defamation of this hero is an insult to Indian culture." (Vultaggio Aff. Ex. 6.) Similarly, on April 27, 1992, Senator Tom Daschle wrote to Hornell expressing his displeasure with the use of the name Crazy Horse. (Vultaggio Aff. Ex. 7.) On May 19, 1992, Dr. Novello appeared before the House Select Committee on Children, Youth and Family. Representative Patricia Schroeder had called the hearing to consider legislation to prohibit use of the name Crazy Horse on alcoholic beverages. No representative of Hornell was permitted to appear at the hearing. (Pls.' Mem.Supp.Mot. at 7; *see also Confronting the Impact of Alcohol Labeling and Marketing on Native American Health and Culture: Hearing before the House Select Committee on Children, Youth, and Families,* 102d Cong., 2d Sess. (1992), Defs.' Mem. Ex. A.)

Subsequently, Representative Frank Wolf offered an amendment to the Treasury, Postal Service and General Government Appropriations Bill then under consideration. The amendment would have prohibited the use of trade names or brand names for alcoholic beverages that bore the name of any deceased individual of public prominence if the use of the name were likely to degrade or disparage the reputation of the individual. (138 Cong.Rec. H5769–70 (July 1, 1992), Vultaggio Aff. Ex. 10.) Representative Wolf made clear that the introduction of the Crazy Horse product was the impetus for the proposed amendment, stating, "[T]he language has been put in because this brewer has developed an alcoholic beverage called Crazy Horse. Crazy Horse was an Indian chief who was known for urging his people not to drink alcohol." A Point of Order was sustained because the amendment attempted to create legislation through an appropriations bill in violation of House of Representatives rules. (138 Cong.Rec.H. 5769–70 (July 1, 1992), Vultaggio Aff. Ex. 10.) Wolf then proposed an amendment explicitly aimed at prohibiting the use of the name "Crazy Horse" on any alcoholic beverage. (138 Cong.Rec.H. 5775 (July 1, 1992), Vultaggio Aff. Ex. 11.) The House approved this bill and referred it to the Conference Committee. Rather than adopting the House bill, the Senate Committee adopted a resolution directing Hornell to negotiate with Sioux leaders and enter into a binding agreement abandoning the use of Crazy Horse as a brand name to "obviate the need for legislation." S.Rep. No. 584, 102d Cong., 2d Sess. 17 (July 31 (legislative day, July 23), 1992), Vultaggio Aff. Ex. 13.)

Hornell claims in its moving papers that Hornell representatives met with Sioux leaders to negotiate a resolution. (Pls.' Mem. Supp.Mot. at 9.) Hornell sought to protect its investment, distributors, suppliers, and work force, in the discontinuation of the Crazy Horse product. (*Id.*) Hornell claims that the Sioux insisted on a general ban of Native American names and symbols in connection with the sale of all commercial products and services. (Letter from John Yellow Bird Steele to Mark Rodman, dated August 12, 1992, Vultaggio Aff. Ex. 16.) Because this demand was beyond the scope of Hornell's authority, negotiations were terminated.

---

**2.** Crazy Horse was a highly revered Oglala Sioux    leader.

Senators Daschle and Adams then proposed legislation banning use of the name Crazy Horse on alcoholic products. (138 Cong.Rec.S. 13235–36 (September 10, 1992), Vultaggio Aff. Ex. 15.) Senator Adams explicitly rebuked Hornell in his statement to the Senate, stating that Hornell had been "insensitive and disrespectful" to the Sioux's request that Hornell discontinue Crazy Horse Malt Liquor. (138 Cong.Rec.S. 13439 (Sept. 14, 1992), Vultaggio Aff. Ex. 17.) The statute was enacted on October 1, 1992 and reads as follows:

> Upon the date of enactment of this Act, the Bureau of Alcohol, Tobacco, and Firearms (ATF) shall deny any application for a certificate of label approval, including a certificate of label approval already issued, which authorizes the use of the name Crazy Horse on any distilled spirit, wine, or malt beverage product; *Provided,* that no funds appropriated under this Act or any other Act shall be expended by ATF for enforcement of this section and regulations thereunder, as it related to malt beverage glass bottles to which labels have been permanently affixed by means of painting and heat treatment, which were ordered on or before September 15, 1992, or which are owned for resale by wholesalers or retailers.

Pub.L. 102–393, § 633. On November 17, 1992, defendant William T. Earle, Chief of the Industry Compliance Division of BATF issued a letter to G. Heileman Brewing Company ("GHBC"), which bottles Crazy Horse Malt Liquor for Hornell, stating that Public Law 102–393, § 633 "mandates the denial of labels [for Crazy Horse Malt Liquor] which have already been approved" and that "BATF is required to 'deny any application for a certificate of label approval, including a certificate of label approval already issued, which authorizes the use of the name Crazy Horse on any distilled spirit, wine, or malt beverage product.'" (Letter from William T. Earle to Jim Kennedy of November 17, 1992, Declaration of Candace E. Moberly, Ex. 2, Defs.' Mem. Ex. B.)

Plaintiff filed its Complaint for declaratory and injunctive relief on December 4, 1992, and also moved the court for a preliminary injunction, preventing defendants from enforcing Public Law 102–393, § 633. As stated above, the parties recast the motion as a summary judgment motion and defendants filed a cross-motion for summary judgment.

## DISCUSSION

### A. *Summary Judgment*

The standards by which a summary judgment motion is decided are well settled. Summary judgment is appropriate where the submitted papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In this case, the parties have stipulated that no issues of fact exist; they dispute only the conclusions of law to be drawn by the Court. *See Brookpark Entertainment, Inc. v. Taft,* 951 F.2d 710, 714 (6th Cir.1991) ("Since [plaintiff] attacks the constitutional validity of the statute on its face, there are no real issues of material fact to be resolved."), *reh'g denied, cert. denied,* —— U.S. ——, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992).

In their Complaint, plaintiffs allege that the Public Law 102–393, § 633 violates the Constitution in the following respects: the suppression of speech in violation of the First Amendment, the denial of equal protection and due process rights in violation of the Fifth Amendment, the issuance of a bill of attainder in violation of Article I, section nine, the taking of property without just compensation in violation of the Fifth Amendment, and a violation of the separation of powers principle. This Report and Recommendation will address each alleged violation, presuming that no issues of fact exist, and will make the necessary conclusions of law with respect to each alleged violation.

### B. *First Amendment*

The fundamental principle of the First Amendment is that the government may not prohibit speech because the ideas expressed therein are offensive. *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 2544, 105 L.Ed.2d 342 (1989) ("If there is a bedrock principle of the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds

the idea itself offensive or disagreeable."). When the government does regulate to prohibit speech based on its content, the regulation is presumptively invalid unless the speech falls into an unprotected category to which lesser standards apply. *R.A.V. v. St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992).[3] Commercial speech is not considered unprotected, but it does enjoy a lesser degree of First Amendment protection than protected speech. *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456–57, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978), *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978).

Plaintiffs argue that although this case involves commercial speech, a strict scrutiny standard nonetheless applies by reason of the Supreme Court's recent decision in *R.A.V. v. St. Paul,* —— U.S. ——, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).[4] *R.A.V.* held that although a city ordinance against the placement of certain symbols on public or private property was facially unconstitutional because it prohibited only those fighting words that would insult or provoke violence on the basis of race, color, creed, religion or gender. The ordinance did not proscribe any other categories of fighting words, such as those which would incite violence on the basis of political affiliation. Because the ordinance's

prohibition was content-based, the Court subjected it to a strict scrutiny standard even though a less rigorous standard would have applied had the ordinance more generally addressed all forms of fighting words. *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2550. Thus, plaintiffs argue that *R.A.V.* sets forth a new requirement that all content-based regulations be analyzed under strict scrutiny, regardless of whether they restrict unprotected categories of speech otherwise subject to a lesser standard. *See Citizens United for Free Speech II v. Long Beach Township Board of Comm'rs,* 802 F.Supp. 1223, 1232–34 (D.N.J.1992) (following *R.A.V.* and applying strict scrutiny to content-based regulation of commercial speech).

The Supreme Court in *R.A.V.,* however, did not go so far as plaintiffs' argument suggests. The Court stated that there are certain types of content-based restrictions of protected speech that may be valid and not subject to strict scrutiny. Two such exceptions, according to the Court, are content discrimination based on the very reason that the particular class of speech is proscribable, —— U.S. at ——, 112 S.Ct. at 2548, and content-based discrimination that proscribes a subclass of speech due to the secondary effects of the speech. *R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2549.[5] Thus, it is not

---

**3.** The general rule is that speech is protected, meaning restrictions of speech are subject to strict scrutiny. *R.A.V. v. St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). Strict scrutiny requires that the government show a compelling objective to regulate the speech, and the regulation must be narrowly tailored to that objective. *Burson v. Freeman,* —— U.S. ——, ——, 112 S.Ct. 1846, 1851, 119 L.Ed.2d 5 (1992). There are, however, several categories of speech which have been deemed unprotected. They are speech intended and likely to promote imminent lawless activity, obscenity, defamation, and fighting words. *See Brandenburg v. Ohio,* 395 U.S. 444, 447–48, 89 S.Ct. 1827, 1829–30, 23 L.Ed.2d 430 (1969); *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964); *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942). *See generally R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2543. These categories are subject to lower degrees of scrutiny and therefore are more easily regulated.

**4.** The issue in *R.A.V.* was the constitutionality of an ordinance which read,

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses, anger, alarm, or resentment in others on the basis of race, color, creed, religion, or gender commits disorderly conduct and shall be guilty of a misdemeanor.

*R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2541. The mode of expression prohibited by the ordinance was characterized as "fighting words," a category previously categorized as unprotected speech. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942).

**5.** An illustration of the first exception which was provided by the Court is that the government "might choose to prohibit only that obscenity which is the most patently offensive *in its prurience-i.e.,* that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which

clear, absent Supreme Court clarification, that plaintiffs' broad-based argument reflects the Supreme Court's current teaching.[6] This Court, therefore, will first analyze Public Law 102–393, § 633 under the traditional, less rigorous inquiry applied to the regulation of commercial speech, then under the strict scrutiny standard.

### 1. Traditional Commercial Speech Inquiry

■ Commercial speech is defined as that speech which proposes a commercial transaction. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976). In order to regulate commercial speech the government must satisfy a four prong test. *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). First, the expression must be protected by the First Amendment; that is, it must concern lawful activity and not be misleading. *Central Hudson*, 447 U.S. at 563–64, 100 S.Ct. at 2350. Second, the government must establish a substantial interest. 447 U.S. at 564, 100 S.Ct. at 2350. Third, the regulation must directly advance the governmental interest asserted. 447 U.S. at 564, 100 S.Ct. at 2350. Finally, the regulation must be no more extensive than necessary to serve the interest asserted. 447 U.S. at 565, 100 S.Ct. at 2350. *See Board of Trustees v. Fox*, 492 U.S. 469, 476–81, 109 S.Ct. 3028, 3032–35, 106 L.Ed.2d 388 (1989).

■ The Crazy Horse Malt Liquor label is indisputably commercial speech. *Friedman v. Rogers*, 440 U.S. 1, 11, 99 S.Ct. 887, 895, 59 L.Ed.2d 100 (1979) ("[T]he trade name is used as part of a proposal of a commercial transaction and nothing more."); *Adolph Coors Co. v. Brady*, 944 F.2d 1543, 1546 (10th Cir.1991) ("Product labels, which are part of a firm's marketing plan to provide certain information to the consumer, also constitute commercial speech.").[7] Thus, Public Law 102–393, § 633, which requires that BATF prohibit use of the name Crazy Horse on any distilled spirit, wine, or malt beverage, is subject to the test set forth in *Central Hudson*, 447 U.S. 557, 100 S.Ct. 2343, and *Board of Trustees*, 492 U.S. 469, 109 S.Ct. 3028. It is the finding of the undersigned that Public Law 102–393, § 633 does not satisfy the third and fourth prongs of this test and is unconstitutional.

#### a. Crazy Horse Label Is Lawful and Is Not Misleading

First, the Crazy Horse label, as commercial speech, is entitled to First Amendment protection because it concerns lawful activity and is not misleading. *Central Hudson*, 447 U.S. at 563–64, 100 S.Ct. at 2350. The sale and distribution of labeled malt beverage is a lawful activity under federal law. U.S. Const. amend. XXI, § 1 (repeal of Prohibition); *Coors*, 944 F.2d at 1547. Additionally, the fact that the Crazy Horse COLA was approved by BATF on February 19, 1992 is evidence that the underlying conduct (use of the name on a malt liquor label) is legal. *See* 27 U.S.C. § 205(e) and 27 C.F.R. 7.20(b). Nor is the Crazy Horse name in any way misleading, as is demonstrated by BATF's

---

includes offensive *political* messages." *R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2546 (emphasis in original) (citations omitted).

With respect to the second exception, the Court stated that the government could restrict a subclass of proscribable speech when the subclass is associated with particular secondary effects. For example, according to the Court, the government could permit all obscene live performances except those involving minors. *R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2546.

**6.** This term the Supreme Court will have the opportunity to clarify unresolved issues raised by *R.A.V.* in the context of commercial speech when

it considers *Edge Broadcasting Co. v. United States*, 732 F.Supp. 633 (1990), *aff'd without op.*, 956 F.2d 263 (4th Cir.1992), *cert. granted*, —— U.S. ——, 113 S.Ct. 809, 121 L.Ed.2d 683 (1992).

**7.** The Court explicitly rejects plaintiffs' argument that use of the Crazy Horse name is actually the personal expression of Don Vultaggio, the Chairman and co-owner of Hornell Brewing, and therefore is entitled to the utmost constitutional protection. Plaintiff cannot seriously liken Vultaggio's freedom of expression in decorating his home in Southwestern style to the use of the name Crazy Horse on a nationally marketed alcoholic beverage.

own finding for COLA purposes.[8] Defendants concede both these points.

### b. *Substantial Interest*

■ Plaintiffs claim that Public Law 102–393, § 633 was enacted for the purpose of "protecting Native Americans from the offensive exploitation of a former Sioux leader's name." (Pls.' Mem. at 42.) It bears repeating that the desire to protect society or certain members of society from the purported offensiveness of particular speech is not a substantial interest which justifies its prohibition. *Texas v. Johnson,* 491 U.S. 397, 399, 109 S.Ct. 2533, 2536, 105 L.Ed.2d 342 (1989) (overturning conviction for flag desecration); *see also Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 71, 103 S.Ct. 2875, 2882, 77 L.Ed.2d 469 (1983) (striking ban on mailing contraceptive advertisements) (citing *Carey v. Population Services International,* 431 U.S. 678, 701, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675 (1977) (striking a New York statute that banned advertisement of display of contraceptives)).

Illustrative of this in the context of commercial speech are lower court decisions addressing governmental efforts to prohibit commercial use of "Sambo's", an appellation with patently offensive connotations to African Americans. In *Sambo's of Ohio, Inc. v. City Council of Toledo,* 466 F.Supp. 177 (N.D.Ohio 1979), the city of Toledo revoked permits to display the name Sambo's on the premises of a restaurant. Because the case was decided before *Central Hudson,* the *Sambo's* court did not formally apply the *Central Hudson* test; however, the court did enjoin the city from enforcing the permit revocation, essentially holding that the government did not have a substantial interest in prohibiting use of the name merely because it was offensive to some. *Sambo's of Ohio,* 466 F.Supp. at 180 (prevention of the use of the name Sambo's because of its offensiveness is an unconstitutional deprivation of

the First Amendment right of free speech). As the district court emphasized,

> One of the basic premises of advertising is that if it is too offensive to too many people, its use will be counterproductive, for those who are offended will not only refuse to buy the product, but also, if they are sufficiently offended, they will attempt to persuade others to refuse also.

*Sambo's of Ohio,* 466 F.Supp. at 180.

Similarly, in *Sambo's Restaurants, Inc. v. Ann Arbor,* 663 F.2d 686 (6th Cir.1981), the Sixth Circuit held that the city of Ann Arbor should be enjoined from denying plaintiffs' use of the Sambo's name. The court rejected the notion that commercial speech is stripped of First Amendment protection because of its ancillary offensiveness. *Sambo's Restaurants,* 663 F.2d at 694–95. It stressed that while use of the name may offend some citizens, the city had failed to produce tangible evidence that use of the sign would, as the City alleged, sufficiently impede racial harmony or equality to justify suppression of protected commercial speech. 663 F.2d at 695.

The legislative history of Public Law 102–393, § 633 clearly suggests that the government's initial objective in enacting the Crazy Horse statute was to protect Native American communities from what it perceived to be an offensive exploitation of the revered Sioux leader's name. *See Coors,* 944 F.2d at 1547 (relying on legislative history to determine government's interest). Surgeon General Antonia Novello stressed the distastefulness of the name Crazy Horse during her initial attacks on the product. (*See* Suggested Remarks for Antonia C. Novello, Vultaggio Aff. Ex. 5.) On June 25, 1992, Senator Pressler stated in his remarks to the Senate that the use of the Crazy Horse label on alcoholic beverages "is an insult to American Indian culture . . . ." (138 Cong.Rec. S8970 (June 25, 1992), Vultaggio Aff. Ex. 8.). Again on August 12, 1992, Pressler stated that Crazy Horse Malt Liquor "is seen by many as an

---

**8.** According to BATF regulations, malt beverage labels shall not contain any statement that is false or untrue in any particular, or that tends to create a misleading impression, any statement, design, device or representation of or relating to analyses, standards or tests which the Director finds to be likely to mislead the consumer, or any statement, design, device or representation of or relating to any guarantee which the Director finds likely to mislead the consumer. 27 C.F.R. 7.29(1), 7.29(4), 7.29(5). *See also* 27 C.F.R. 7.23(a), 7.23(b).

insensitive and outrageous offense." (138 Cong.Rec. S12493 (Aug. 12, 1992), Vultaggio Aff. Ex. 8.). Representative Campbell, on July 1, 1992 also stated that the name is a "cultural insult to the Indian people." (138 Cong.Rec. H5775 (July 1, 1992), Vultaggio Aff. Ex. 10.) The legislative history is replete with other references to the offensiveness and insensitive nature of the use of the name Crazy Horse. (*See Confronting the Impact of Alcohol Labeling and Marketing on Native American Health and Culture: Hearing before the House Select Committee on Children, Youth, and Families,* 102d Cong., 2d Sess. (1992), Defs.' Mem. Ex. A; 138 Cong.Rec. S8970 (June 25, 1992), Vultaggio Aff. Ex. 8; 138 Cong.Rec. S12493 (Aug. 12, 1992), Vultaggio Aff. Ex. 9.) If the only interest asserted by the government were its desire to abate or avert the perceived offensiveness of the Crazy Horse name, it would not constitute a substantial interest under the *Central Hudson* test. Indeed that is precisely the type of objective that is prohibited by the First Amendment and was rejected by the courts in both *Sambo's* cases. *See Sambo's Restaurants,* 663 F.2d at 695; *Sambo's of Ohio,* 466 F.Supp. at 179–80.

██ But that is not the end of our inquiry. Contrary to plaintiffs' argument, a particular piece of legislation may be valid where "the circumstances giving rise to [the] legislation have changed so long as the legislation continues to serve some valid and substantial governmental interest." *Coors,* 944 F.2d at 1549. In *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the Supreme Court stated that reliance on an interest not asserted when the challenged statute was enacted into law "is permissible since the insufficiency of the original motivation does not diminish other interests that the restriction may now serve." *Bolger,* 463 U.S. at 70–71, 103 S.Ct. at 2883 (footnotes omitted) (citing *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 460, 98 S.Ct. 1912, 1920, 56 L.Ed.2d 444 (1978); *Doe v. Bolton,* 410 U.S. 179, 190–91, 93 S.Ct. 739, 746–47, 35 L.Ed.2d 201 (1973)). Even if this Court is not persuaded that health concerns were the catalyst for the legislation, the Court must not "restrain the exercise of lawful power on the assumption that a wrongful purpose or motive has caused the power to be exerted," *United States v. O'Brien,* 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968) (quoting *McCray v. United States,* 195 U.S. 27, 56, 24 S.Ct. 769, 776, 49 L.Ed. 78 (1904)), and must accept a properly asserted substantial interest of the government.

Defendants assert that the government's substantial interest in enacting Public Law 102–393, § 633 is the protection and preservation of the health, safety, and welfare of Native Americans by preventing the enhanced appeal of alcohol use among Native Americans due to the use of the name Crazy Horse on a malt liquor. (Defs.' Mem. at 18.) This argument is based on the premise that the use of the name Crazy Horse will stimulate the demand for malt liquor in Native American communities. (*Id.*) There is no evidence even indicating what Crazy Horse sales are, or what share of the market this product holds, let alone how much is consumed by Native Americans or whether alcohol consumption by Native Americans has increased since Crazy Horse was introduced.

Courts have repeatedly held that the government has a substantial interest in protecting citizens from the problems associated with alcohol. *See Dunagin v. Oxford,* 718 F.2d 738, 747 (5th Cir.1983) (en banc), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *Oklahoma Telecasters Ass'n v. Crisp,* 699 F.2d 490, 500 (10th Cir. 1983), *rev'd on other grounds sub nom., Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). Plaintiffs have even conceded that the government does have a substantial interest in the asserted health concerns related to alcohol.

Like plaintiffs, the government has also relied on the legislative history to support its argument. At the hearing entitled, *Confronting the Impact of Alcohol and Marketing on Native American Health and Culture,* which was held before the House Select Committee on Children, Youth, and Families in May, 1992, research was presented documenting alcohol related health problems that afflict Native American society. (*See* Defs.' Mem. Ex. A.) The alcoholism rate among Native Americans is six times higher than

that of the general population. (*Id.* at 7.) Native American infants are twenty times more likely than other United States infants to be born with Fetal Alcohol Syndrome. (*Id.*) High rates of alcohol use and abuse among Native American teenagers are also reported. (*Id.* at 7–8.) Given the serious nature of these problems, the government does have a substantial interest in preventing further use of alcohol among Native Americans in order to reduce its deleterious effects.[9]

Therefore, even though the avoidance of offensiveness is not a substantial interest for Public Law 102–393, § 633, the concerns currently asserted by the government do constitute a substantial interest. While Crazy Horse may not exacerbate alcohol use, the government's interest in preventing further alcohol abuse and its resultant problems is most certainly substantial. In light of this fact, the Court defers to the asserted interest of the government and finds that the prevention of the enhanced appeal of alcohol use among Native Americans is substantial, satisfying this prong of the *Central Hudson* test.

**9.** In support of their asserted interest defendants also rely on the federal government's history of a special "trust relationship" with Native Americans. It is accurate that the government has assumed a duty toward Native Americans to protect certain lands that have been identified as "Indian lands." *See United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Seminole Nation v. United States,* 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480, 1777 (1942); *Cramer v. United States,* 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923); *Lane v. Pueblo of Santa Rosa,* 249 U.S. 110, 39 S.Ct. 185, 63 L.Ed. 504 (1919); *Cherokee Nation v. Georgia,* 5 Pet. 1, 17, 8 L.Ed. 25 (1831). Courts have also held that Native Americans have "unique legal status under federal law" and that Congress has "plenary power ... to legislate on behalf of federally recognized tribes." *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Rupert v. Director, United States Fish and Wildlife Service,* 957 F.2d 32, 34 (1st Cir.1992). In this regard, several laws challenged as creating racial classifications have been upheld as being rationally related to the government's "unique obligations toward the Indians." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 673 n. 20, 99 S.Ct. 3055, 3068 n. 20, 61 L.Ed.2d 823 (1979) (citing *Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974)). All these challenged classifications, however, in some way

### c. Direct Advancement

■ Although defendants have asserted a substantial interest, they have not established that Public Law 102–393, § 633 directly advances that interest. *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350. *Central Hudson* requires that the restriction must be narrowly drawn and that it "extend only as far as the interest it serves." 447 U.S. at 565, 100 S.Ct. at 2351. A nexus between the ends and the means must be established by the party who seeks to restrict the speech. *Linmark Assocs., Inc. v. Willingboro,* 431 U.S. 85, 95–96, 97 S.Ct. 1614, 1619–20, 52 L.Ed.2d 155 (1977); *Coors,* 944 F.2d at 1550. This burden requires the government to demonstrate an "immediate connection" between the prohibition and the government's asserted interest. *Coors,* 944 F.2d at 1549 (citing *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351)). A mere "speculative, casual [sic: causal] relationship" is insufficient to satisfy this prong of the *Central Hudson* test. *Sambo's Restaurants,* 663 F.2d at 695. Similarly, ineffective or remote support for the existence of such a relationship is inadequate. *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350.

treated Native Americans differently from the rest of the population. *See, e.g., United States v. Antelope,* 430 U.S. 641, 645–46, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977); *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation,* 425 U.S. 463, 479–81, 96 S.Ct. 1634, 1644–45, 48 L.Ed.2d 96 (1976); *Morton,* 417 U.S. at 554, 94 S.Ct. at 2484; *Rupert,* 957 F.2d at 34–35. In this way, these cases are not analogous to Public Law 102–393, § 633.

Defendants also cite *McNabb v. Bowen,* 829 F.2d 787 (9th Cir.1987), where the court required the Indian Health Service to pay for the costs of medical care for an Indian child where the state, which had primary responsibility in the area, refused to do so. While the court did acknowledge the trust relationship in placing the burden on the federal government, it also placed significant reliance on the Snyder Act which authorized the Indian Health Service to provide health benefits and care for Native Americans "for the relief of distress and conservation of health." *McNabb,* 829 F.2d at 792. Since Public Law 102–393, § 633 does not involve the actual provision of health benefits to Native Americans, the analogy is not appropriate. Therefore, the government's substantial interest does not rest on thus alternate "trust relationship" ground, but on the health concerns documented above.

Here, the defendants failed to offer any evidence that suggests that Public Law 102–393, § 633—prohibiting only the use of the Crazy Horse label on liquor products—directly advances their interest in preventing the enhanced appeal of alcohol use among Native Americans. Indeed, the legislative record as to the offensiveness of the Crazy Horse label would seem as likely to suggest the contrary proposition, that Native Americans would be discouraged from consuming an alcoholic beverage that dishonors the name of a revered Native American leader.

Defendants' primary argument on this element of *Central Hudson* is that the legislature is entitled to considerable deference in its belief that the statute would directly advance the interest. For this proposition, defendants rely on *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986), where the Supreme Court upheld a prohibition of advertising for casino gambling. The government's substantial interest in *Posadas* was to reduce the demand for casino gambling among Puerto Rico residents. *Posadas,* 478 U.S. at 341, 106 S.Ct. at 2976. The Court held that the legislature was reasonable in its belief that advertising would lead to an increase in gambling and did not require empirical evidence of such a causal relationship. 478 U.S. at 341, 106 S.Ct. at 2976. *Posadas* is obviously distinguishable from the case at bar. First, the ordinance in *Posadas* prohibited the advertising of all casino gambling. In order to be even remotely analogous, Public Law 102–393, § 633 would have to prohibit all alcohol, or at least all malt liquor products, that carry Native American names or symbols on their labels. Alternatively, *Posadas* would be directly analogous if the Puerto Rico ordinance in *Posadas* would have had to prohibit the advertising of only one particular casino, not all casinos, and indeed, would have had to single out one casino because its name was offensive to the very people the casino's advertising was seeking to attract.

Furthermore, in *Posadas,* the Court was able to defer to the legislature on the basis of precedent, *see Dunagin v. Oxford,* 718 F.2d 738, 747 (5th Cir.1983), *cert. denied,* 467 U.S.

1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *Oklahoma Telecasters Assoc. v. Crisp,* 699 F.2d 490, 501 (10th Cir.1983), that established the causal relationship between advertising and consumption. *See Coors,* 944 F.2d at 1550. Here, there is no comparable precedent that suggests, let alone establishes, an immediate connection between the use of one specific Native American name, Crazy Horse, and increased consumption of alcohol by Native Americans. The government asks the Court to make a leap of faith and logic on the point by concluding that because advertising may increase consumption and a product label is a form of advertising, the mere use of the Crazy Horse label product will enhance consumption. It is true that in a general sense of the word "advertising", a product label is a form of advertising. But that is not to say that a product label, standing alone, can have a remotely comparable effect on product consumption as would all advertising, such as print ads, billboards, and radio and television commercials.

Defendants base their claim that Crazy Horse will increase alcohol consumption among Native Americans on the naked premise that because Crazy Horse was such a revered leader, Native American youths will be inclined to consume Crazy Horse, in an effort to identify with the leader and the noble Native American heritage. (*See* Defs.' Mem. at 23–25.) In testimony before the Committee, some witnesses did imply that alcohol abuse among Native Americans would be exacerbated by the marketing of Crazy Horse Malt Liquor for this reason. (*Id.*)

The Court, however, is not at all convinced that the use of a revered Native American name may cause any discernible increase in alcohol consumption among Native Americans, particularly when plaintiffs have indicated, and defendants have not disputed, that Crazy Horse has not been marketed specifically toward Native Americans and plaintiffs' use of this name, according to legislative findings is, if anything, offensive to Native Americans. (*See* Pls.' Local 3(g) Statement ¶¶ 14, 16.) The government's theory, in short, is too remote and speculative to satisfy the direct advancement prong of *Central*

*Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350 (prohibition fails under First Amendment if it provides only "ineffective or remote support" for governmental objective). While empirical evidence is not required, absent such evidence the government's argument is merely speculation.

Plaintiffs also argue that because Public Law 102–393, § 633 is underinclusive, it does not directly advance the government's interest. It is true that underinclusiveness is not necessarily fatal to a restriction of commercial speech, *Posadas,* 478 U.S. at 342, 106 S.Ct. at 2977; however, the fact that other alcoholic products bear Native American names and symbols does weaken the direct advancement argument. In *Posadas,* the government did not prohibit the advertisement of all gambling, only casino gambling. *Posadas,* 478 U.S. at 342, 106 S.Ct. at 2977. The court found that this underinclusiveness did not indicate that the prohibition did not directly advance to interest of reducing the demand for games of chance. The legislature apparently reasonably believed that greater risks were involved in casino gambling than other types of nonrestricted gambling. Here, the government claims that the cultural distinctions between Crazy Horse and other Native American names that have been used in this fashion serve to obviate any apparent underinclusiveness. According to the government, Crazy Horse was such a significant cultural and spiritual leader in Native American society, the use of his name, unlike the other names, will engender more tendency to drink the product bearing his name, as a sort of tribute to him. The logic of this conceit is not entirely persuasive to the Court. Indeed, it merely reinforces the Court's conclusion that the government's explanation for singling out the Crazy Horse label rests on a precarious foundation of speculation.

· The burden is on the government to establish that there is an immediate connection between the interest and the restriction on speech; mere plausibility is insufficient. *Linmark Assocs., Inc. v. Willingboro,* 431 U.S. 85, 95–96, 97 S.Ct. 1614, 1619–20, 52 L.Ed.2d 155 (1977); *Coors,* 944 F.2d at 1550; *Sambo's Restaurants,* 663 F.2d at 695; *Edge*

*Broadcasting Co. v. United States,* 732 F.Supp. 633, 639 (E.D.Va.1990), *aff'd without op.,* 956 F.2d 263 (4th Cir.1992), *cert. granted,* — U.S. ——, 113 S.Ct. 809, 121 L.Ed.2d 683 (1992). The government has not satisfied its burden.

In addition, the Fourth Circuit recently held that a statute that banned particular commercial speech toward all in an effort to protect the concerns of some failed the direct advancement prong of *Central Hudson. Edge Broadcasting Co. v. United States,* 732 F.Supp. 633, 639–40 (E.D.Va.1990), *aff'd without op.,* 956 F.2d 263 (4th Cir.1992), *cert. granted,* — U.S. ——, 113 S.Ct. 809, 121 L.Ed.2d 683 (1992). Analogously, Public Law 102–393, § 633 imposes a burden on everyone who might have the desire to drink Crazy Horse, in an effort to protect only a segment of the population, and thereby does not directly advance the government's interest.

In sum, the government has failed to show how Public Law 102–393, § 633 directly advances the substantial interest of preventing enhanced alcohol use among Native Americans. "The impact on these laudable goals by [the government] is speculative at best." *Sambo's Restaurants,* 663 F.2d at 695. The statute fails to satisfy the third prong of the *Central Hudson* test. *See Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350.

#### d. *Proportion to the Interest Asserted*

The fourth prong that the government must satisfy is that the regulation must be in proportion to the interest asserted. *Board of Trustees v. Fox,* 492 U.S. 469, 476, 109 S.Ct. 3028, 3032, 106 L.Ed.2d 388 (1989); *see also Central Hudson,* 447 U.S. at 566–67, 100 S.Ct. at 2351. A regulation is in proportion if it is no more extensive than necessary to further the government's interest. *Central Hudson,* 447 U.S. at 569–70, 100 S.Ct. at 2353. The Supreme Court clarified in *Board of Trustees v. Fox,* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) that this prong of Central Hudson should not be interpreted as a "least restrictive means" test. *Board of Trustees,* 492 U.S. at 477, 109 S.Ct. at 3033. Instead, the regulation must be narrowly tailored to the government's interest, 492

U.S. at 477, 109 S.Ct. at 3033, and must not "burden substantially more speech than is necessary to further the government's interest." 492 U.S. at 478, 109 S.Ct. at 3034 (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989)). The Court in *Board of Trustees* noted that it is "loath to second guess the Government's judgment to that effect," 492 U.S. at 478, 109 S.Ct. at 3034, but concluded that there must be a "reasonable fit" between the regulation and the government's interest and that the cost of burdening speech must be "carefully calculated." 492 U.S. at 480, 109 S.Ct. at 3035. The Court explicitly rejected the less rigorous rational basis test typically used in equal protection analysis for this prong of *Central Hudson.*[10]

Although commercial speech may enjoy less protection than political speech, the Supreme Court, in fact, accords it a high value unless it is false or misleading or causes distinctive adverse effects which directly flow from the commercial speech regulated. *Discovery Network, Inc. v. Cincinnati,* 946 F.2d 464, 469–71 (6th Cir.1991), *cert. granted,* — U.S. ——, 112 S.Ct. 1290, 117 L.Ed.2d 514 (1992) (citing *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986); *Young American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)). It is the government's claim that the use of the name Crazy Horse, on its own, will have adverse effects on the Native American population by increasing alcohol use and thereby exacerbating the problems correlated with alcohol abuse. Assuming, *arguendo,* this precept, however dubious, complete revocation of the Crazy Horse Malt Liquor label is not a reasonable fit to this interest. The prohibition prevents use of the label anywhere simply to protect a relatively small segment of the population. The prohibition is not, as it could have been, limited to Native American reservations or narrow geographic areas where there is a demonstrably high concentration of Native Americans.

Nor does this sweeping prohibition take into account sensible alternatives that would not require any direct limit on use of the Crazy Horse label, such as education programs to inform Native Americans of the dangers of alcohol. Another possibility is an additional warning on the Crazy Horse bottle informing Native Americans of the dangers of alcohol or of the high incidence of alcoholism and its effects in Native American communities. While the least restrictive means is not required, the regulation must be narrowly tailored to the government's interest. With obvious alternatives available that do not hinder speech in any way, or hinder it far less, the statute is not, by any means, a reasonable fit.

In sum, it is the finding of this Court that Public Law 102–393, § 633 is more extensive than necessary to serve the interest asserted by the government, and as such also fails the fourth prong of the *Central Hudson* test.

### 2. *Strict Scrutiny*

As discussed above, the Supreme Court, *R.A.V. v. St. Paul,* — U.S. ——, ——, 112 S.Ct. 2538, 2550, 120 L.Ed.2d 305 (1992), applied strict scrutiny to a content-based restriction of fighting words. The critical point of the decision is that even protected speech may not be regulated on the basis of its content, other than that proscribable content which causes it to fall into an unprotected category. *R.A.V.,* — U.S. at ——, 112 S.Ct. at 2543. In dicta the Court did use an example of this general principle using commercial speech. —— U.S. at ——, 112 S.Ct. at 2546. The Court stated that the government "may choose to regulate price advertising in one industry but not in other, because [of] the risk of fraud ... [but] may not prohibit only that commercial advertising that depicts men in a demeaning fashion." —— U.S. at ——, 112 S.Ct. at 2546 (citations omitted). Nevertheless, as stated earlier, the use of only one example pertaining to commercial speech does not convince this Court that strict scrutiny shall now apply to all content-based restrictions of com-

---

**10.** The rational basis test requires only that the regulation be rationally related to a legitimate governmental interest. Legislation is rarely struck when this test is applied. *See Regan v. Taxation With Representation,* 461 U.S. 540, 547, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983).

mercial speech, casting aside the well established *Central Hudson* test. *Contra Citizens United for Free Speech II v. Long Beach Township Board of Comm'rs*, 802 F.Supp. 1223, 1230 (D.N.J.1992). Without further clarification from the Supreme Court, however, it appears necessary to apply the *R.A.V.* analysis in addition to the *Central Hudson* test.

Strict scrutiny requires that the challenged statute is narrowly tailored to a compelling governmental interest. *R.A.V.*, —— U.S. at ——, 112 S.Ct. at 2550. The government has claimed that its interest in enacting Public Law 102–393, § 633 is the prevention of the enhanced appeal of alcohol use among Native Americans, while plaintiffs have asserted that the actual interest was the avoidance of the perceived offensiveness the use of Crazy Horse; however, as is discussed in fuller detail in the commercial speech analysis above, *see* discussion *supra* at 1234–1236, the Court shall defer to the interest asserted by the government for the purposes of this analysis. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); *Doe v. Bolton*, 410 U.S. 179, 190–91, 93 S.Ct. 739, 746–47, 35 L.Ed.2d 201 (1973), *reh'g denied*, 410 U.S. 959, 93 S.Ct. 1410, 35 L.Ed.2d 694 (1973); *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968); *Coors*, 944 F.2d at 1549.

The prevention of the enhanced appeal of alcohol use is certainly a compelling interest. *See Dunagin v. Oxford*, 718 F.2d 738, 747 (5th Cir.1983) (en banc), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984); *Oklahoma Telecasters Ass'n v. Crisp*, 699 F.2d 490, 500 (10th Cir.1983), *rev'd on other grounds sub nom.*, *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). The government has a compelling interest in preventing enhanced use, given the plethora of problems associated with alcohol within Native American communities. (*See* Defs.' Mem. Ex. A.)

Nevertheless, as discussed above in the context of the fourth prong of *Central Hudson*, Public Law 102–393, § 633 is not narrowly tailored to that interest. Because the law does not even directly advance the government's interest, it is axiomatic that it is not narrowly tailored to that interest. Measures that do not burden speech in any way could have been advanced by the government, including but not limited to counterspeech concerning the dangers inherent in alcohol abuse. Although the government contends that counterspeech is not required of the government before regulating speech, the Court finds that there is no evidence that the law will advance the interest in any way; therefore, the proscription of speech is not narrowly tailored.

For the reasons set forth above, it is respectfully recommended that Public Law 102–393, § 633 violates the First Amendment, and summary judgment should be granted in favor of plaintiffs on this claim.

A finding of unconstitutionality on the First Amendment challenge is sufficient to strike the statute and grant summary judgment in favor of plaintiffs. Nevertheless, for the purposes of this Report and Recommendation, the undersigned will engage in analysis of all the constitutional violations that have been alleged.

### C. Equal Protection

Plaintiffs allege that Public Law 102–393, § 633 violates the equal protection clause of the Fifth Amendment. The doctrine of equal protection requires that all persons similarly situated shall be treated alike. *Barbier v. Connolly*, 113 U.S. 27, 31, 5 S.Ct. 357, 359, 28 L.Ed. 923 (1885). When the government regulates in a way that treats similarly situated people differently with respect to a fundamental right, strict scrutiny must be applied to the regulation. *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 17 & 37–38, 93 S.Ct. 1278, 1288 & 1299, 36 L.Ed.2d 16 (1973). First Amendment protection of speech, even commercial speech, is a fundamental right; therefore, strict scrutiny will apply where there is a differentiation of treatment between similarly situated persons.

Courts have struck statutes that restrict a particular type of speech only for specific groups while not restricting the same type of speech for other groups. *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of*

*Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983); *Salem Inn v. Frank,* 522 F.2d 1045 (2d Cir.1975); *Memphis Publishing Co. v. Leech,* 539 F.Supp. 405 (W.D.Tenn. 1982). In *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980), the Supreme Court struck on equal protection grounds a law that prohibited picketing in some locations but not in others. Similarly, in *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), the Court held that a statute that banned all picketing, with the exception of labor picketing near schools violated equal protection.

Plaintiffs claim that they are being treated differently from other producers of alcoholic beverages who use Native American names and symbols on their bottles. Public Law 102–393, § 633, however, applies to all beverage producers alike: Crazy Horse may not be used on any alcoholic beverage by anyone. Conversely, Hornell Brewing is still free to use any other Native American name on its product. Therefore, plaintiffs have failed to establish that they have been treated differently from any similarly situated persons or entities, and as such have failed to satisfy the threshold of an equal protection claim.[11] Therefore, it is unnecessary to engage in the strict scrutiny analysis and it is respectfully recommended that summary judgment be granted in favor of defendants on this claim.

### D. Due Process

The Fifth Amendment guarantees that the federal government shall not deprive a person life, liberty or property without due process of law. U.S. Const. amend. V. Plaintiffs claim that the due process guarantee prohibits Congress from "singling out" Hornell by proscribing use of the name Crazy Horse on alcoholic beverages. The Court agrees with defendants that due process offers no such protection against a statute that affects a specific group or entity.[12]

Plaintiffs have relied on cases where courts invalidated state statutes that authorized citizen referenda to revoke the liquor licenses of particular establishments. *Brookpark Entertainment, Inc. v. Taft,* 951 F.2d 710 (6th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992); *87 South Rothschild Liquor Mart v. Kozubowski,* 752 F.Supp. 839 (N.D.Ill.1990). The courts in those cases held that the statutes violated due process because they effected an impermissible delegation of legislative authority to the public, because of the "arbitrariness inherent in a referendum." *Brookpark,* 951 F.2d at 716; *see Kozubowski,* 752 F.Supp. at 842 (in a referendum, there is "no criterion for peering beneath the voters' decisionmaking") (quoting *Philly's v. Byrne,* 732 F.2d 87, 92 (7th Cir.1984)). The Court agrees with defendants that such cases are irrelevant to the present controversy, the crux of which is the legislative action of Congress. By enacting Public Law 102–393, § 633, Congress has not delegated any legislative authority, thereby permitting an arbitrary decision which would affect only plaintiffs. Furthermore, as already discussed, Public Law 102–393, § 633 does not apply only to the plaintiffs; again, all individuals and entities are prohibited from using the name Crazy Horse on an alcoholic beverage. Therefore, it is unclear

---

11. The Court also rejects plaintiffs' eleventh hour argument that Public Law 102–393, § 633 is a race based statute that thereby requires application of strict scrutiny. (*See* Pls.' Reply Mem. at 16.) Plaintiffs argue that because the statute was enacted with the purpose of protecting Native Americans, it is "racially specific" and violates equal protection.

However, equal protection proscribes race based classifications, not all statutes whose purpose it is to protect certain racial or ethnic groups. The cases relied on by plaintiffs involved laws that facially distinguished between distinct racial groups. *See Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). In these cases, the challenged laws required the government to treat differently a specific racial group. In this way the laws created race based classifications to which strict scrutiny was applied. Again, Public Law 102–393, § 633 treats all persons and groups in the same manner: no one may use the name Crazy Horse on an alcoholic beverage. The statute was enacted on behalf of protecting a specific ethnic group; however, it requires no differential treatment on the basis of race. For this reason, this Court declines from applying strict scrutiny to the statute.

12. Defendants argue that to accept plaintiffs' premise would obviate the need for the Bill of Attainder clause, discussed below. The Court also perceives that plaintiffs' argument is a mere repetition of their equal protection claim.

how these cases establish a due process violation, and it is respectfully recommended that summary judgment on this claims be granted in favor of defendants.[13]

### E. Bill of Attainder

Plaintiffs have claimed that Public Law 102–393, § 633 constitutes a bill of attainder, in violation of Article I, § 9 of the Constitution. In *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), the Supreme Court recognized three necessary inquiries to determine whether the Bill of Attainder Clause has been violated by an act of Congress. First, a bill of attainder singles out an individual or group for punishment. *Selective Serv. Sys.*, 468 U.S. at 847, 104 S.Ct. at 3352. The punished party need not be named specifically in the legislation, but may be designated by terms in the act that operate to specify particular individuals or groups. *Communist Party of United States v. Subversive Activities Control Board*, 367 U.S. 1, 86–87, 81 S.Ct. 1357, 1405, 6 L.Ed.2d 625 (1961). The second feature of a bill of attainder is that it inflicts punishment on the individual or group specified. *Selective Serv. Sys.*, 468 U.S. at 851, 104 S.Ct. at 3354. The third characteristic of a bill of attainder is that it denies the protection of judicial process. 368 U.S. at 847–48. To be designated a bill of attainder, an act must meet these three conditions.

With respect to the first characteristic, the mere singling out of an individual or group by legislation does not automatically constitute a bill of attainder. In *Nixon v. Administrator of General Servs.*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Court upheld a statute that instructed the administrator of General Services to take custody of President Nixon's papers and tape recordings; the law referred to the President by name. The Supreme Court held that as long as the singling out is not done for punitive purposes, specific designation of a group or individual by a statute does not necessarily violate the Bill of Attainder Clause. *Nixon*, 433 U.S. at 475–76, 97 S.Ct. at 2806–07. Similarly, if the statute pursues a valid interest then the fact that it affects only one organization does not invalidate the statute.[14] *See Flemming v. Nestor*, 363 U.S. 603, 614, 80 S.Ct. 1367, 1374, 4 L.Ed.2d 1435 (1960) (distinguishing between the effect of a statute on an individual and a statute targeted to an individual), *reh'g denied*, 364 U.S. 854, 81 S.Ct. 29, 5 L.Ed.2d 77 (1960).

Therefore in the present case, the singling out of the name Crazy Horse in Public Law 102–393 § 633 is not dispositive of the bill of attainder issue although the hearing transcript and congressional record refer directly to the plaintiff and its product. (*See* Defs.' Mem.Ex. A.) The record makes clear that the concern of the House Select Committee was not the production and distribution of malt liquor by plaintiffs. The act proscribes only the use of the name Crazy Horse on alcoholic beverages. The fact that plaintiffs were the only organization planning to use that particular name in the future in a manner proscribed by the statute (*see* Moberly Deposition ¶ 4), is not dispositive. All other liquor producers or distributors, as well as plaintiffs are proscribed by the statute from using the name Crazy Horse. Pursuant to the statute, and according to the government's attorney at oral argument, plaintiffs are free to brew, bottle, and distribute its product, but could not continue to use its name.

The second prong of the test for identifying a bill of attainder requires that the act inflict punishment. *Selective Serv. Sys.*, 468 U.S. at 851, 104 S.Ct. at 3354. A statute is punitive if it falls within the historical meaning of legislative punishment, has no nonpun-

---

13. From the scant analysis provided by both parties on this issue, it is even unclear whether the claim is one of a substantive or procedural due process violation. While there may be a basis for finding a violation of either due process guarantee, *see, e.g., Cabo Distributing Co. v. Brady*, No. C–92–2591–DLJ, —— F.Supp. —— slip op. at 17–26 (N.D.Cal. Oct. 22, 1992), such grounds have not been alleged or argued by the parties. Therefore, this Court declines from further consideration of the issues.

14. Of course, it is the finding of this Court that Public Law 102–393, § 633 fails on the First Amendment, but if assuming *arguendo* it were constitutional under the First Amendment, the pertinent facts in this prong of bill of attainder analysis would not invalidate the statute.

itive function, or reflects, by the record, a congressional intent to punish. 468 U.S. at 852, 104 S.Ct. at 3355.

The historical definition of punishment traditionally encompasses death sentences, imprisonments, banishment, the punitive confiscation of property and legislative bars to participate by individuals or groups in specific employments or professions. 468 U.S. at 852, 104 S.Ct. at 3355. "Sanctions that ordinarily would not be considered punishment in the penal context may be severe enough to be treated as punishment for bill of attainder purposes." *McMullen v. United States,* 953 F.2d 761, 766 (2d Cir.1992). Public Law 102–393, § 633 does not impose any of these traditional punishments. While plaintiffs argue that their property has been confiscated, within the context of bill of attainder, the revocation of Crazy Horse does not constitute a punitive confiscation. *640 Broadway Renaissance Co. v. Cuomo,* 740 F.Supp. 1023, 1035–36 (S.D.N.Y.1990), *aff'd,* 927 F.2d 593 (2d Cir.1991).

Nor is the purpose of the Public Law 102–393, § 633 punitive. The Court must determine whether the act can reasonably be said to further nonpunitive legislative purposes. *Nixon,* 433 U.S. at 476–77, 97 S.Ct. at 2807. If the only purpose of the Act appears to be punishment the act is unconstitutional. 433 U.S. at 477.

As discussed above, the record shows that the purpose of Public Law 102–393, § 633 was the protection and preservation of health by preventing the enhanced appeal of alcohol use among Native Americans.[15] While in the context of First Amendment analysis, this Court found that the statute did not directly advance that interest, and was more extensive than necessary to serve that interest, the purpose of the statute itself is substantial and nonpunitive. It is important to note that under the First Amendment the statute failed a significantly higher standard of review than is at issue in the bill of attainder context. As was indicated in the equal protection analysis, however, the statute would pass the lowest of standards, the rational basis test, which is most similar to the test herein defined for the bill of attainder. Un-

der the Bill of Attainder Clause the only question with regard to the purpose is whether the government is pursuing nonpunitive goals. *Selective Servs. Sys.,* 468 U.S. at 853–54, 104 S.Ct. at 3355–56, and given that far more severe penalties have been upheld as nonpunitive for bill of attainder purposes, *Linnas v. INS,* 790 F.2d 1024, 1030 (2d Cir.), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986), the implication of Public Law 102–393, § 633 cannot be considered punishment.

Finally, with regard to the second characteristic of a bill of attainder, the legislative record does not demonstrate an intent to punish. *Selective Servs. Sys.,* 468 U.S. at 852, 104 S.Ct. at 3355. "[O]nly the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground." *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960). The congressional record does not evince this clear proof. Rather the record shows that Congress intended to prohibit the use of the name Crazy Horse due to concerns about alcohol use among Native Americans, and concerns about the offensiveness of the product name. While witnesses before the House Select Committee did express indignation at Hornell's use of the name Crazy Horse, such proof is insufficient to find that the members of Congress sought to punish Hornell for use of the name. *LILCO v. Cuomo,* 666 F.Supp. 370, 405 (N.D.N.Y.1987), *vacated in part,* 888 F.2d 230 (2d Cir.1989).

Therefore, because Public Law 102–393, § 633 does not single out an individual for punishment, or inflict punishment on the identified individual, the statute is not a bill of attainder. On this claim, therefore, it is respectfully recommended that summary judgment be granted in favor of defendants.

### F. Taking of Property Without Just Compensation

Plaintiffs also claim that Public Law 102–393, § 633 constitutes a taking of property without just compensation, in violation of the Fifth Amendment. Defendants argue only that this Court does not have jurisdiction to evaluate this claim; they state that only the

---

**15.** Again, it is under First Amendment analysis that the Court finds the statute does not directly advance the asserted interest. However, that

determination does not impact upon the question of whether the legislature's purpose was legitimate in bill of attainder analysis.

United States Court of Claims, pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), has jurisdiction over claims for damages. However, plaintiff has sought a declaratory judgment that Public Law 102–393, § 633 is unconstitutional, not damages from the government. This Court clearly has jurisdiction to decide whether there has been a taking within the meaning of Takings Clause. *See Jim Young Develop. Corp. v. State Highway Comm'n of Missouri,* 56 F.R.D. 38, 40 (W.D.Mo.1971) ("The applicable rule regarding federal jurisdiction ... of condemnation actions ... is that the question of whether property was taken without due process of law or just compensation constitutes a 'federal question' within the meaning of [28 U.S.C. § 1331].") (citing *Cuyahoga River Power Co. v. City of Akron,* 240 U.S. 462, 36 S.Ct. 402, 60 L.Ed. 743 (1916); *Raymond v. Chicago Union Traction Co.,* 207 U.S. 20, 28 S.Ct. 7, 52 L.Ed. 78 (1907); *Foster v. City of Detroit,* 405 F.2d 138 (6th Cir.1968); *Foster v. Herley,* 330 F.2d 87 (6th Cir.1964); *Haczela v. City of Bridgeport,* 299 F.Supp. 709 (D.Conn. 1969); *Sayre v. United States,* 282 F.Supp. 175 (N.D.Ohio 1967)); *see also Narramore v. United States,* 960 F.2d 1048 (Fed.Cir.1992).

Thus, the remaining questions are whether the Crazy Horse COLA is property for the purposes of the Takings Clause, and whether there has been a taking. Assuming, without deciding, that the COLA is property, *see Cabo Distributing Co. v. Brady,* 821 F.Supp. 601, 609 (N.D.Cal.1992) (COLA for Black Death Vodka is a legitimate entitlement and therefore property under Takings Clause analysis), this Court is not convinced that revocation of the COLA constitutes a taking.

Challenges of governmental action under the Takings Clause are to be decided on an *ad hoc* basis. *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986). Three factors are considered in the determination of whether a taking has been effected: the economic impact of the regulation, the extent to which the regulation has interfered with distinct investment backed expectations, and the character of the government action. *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026.

Although plaintiffs have made only general statements and offered no substantive documentation with respect to the economic losses they will incur if the Crazy Horse COLA is revoked, it is likely that some economic loss would be shouldered by plaintiffs if Public Law 102–393, § 633 were upheld and enforced. It is also probable that enforcement would have a significant impact on plaintiffs' "investment backed expectations" for the product.

Nevertheless, Public Law 102–393, § 633 does not constitute a taking under the third factor to be considered. For government action to have the character of a taking, it must "physically invade or misappropriate assets for its own." *Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026. The Court has repeatedly emphasized that there must be a taking *for public use* to characterize government action as a taking in violation of the Fifth Amendment. *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1000–01, 104 S.Ct. 2862, 2871, 81 L.Ed.2d 815 (1984). Even the "adjustment of benefits and burdens of economic life to promote the common good" is insufficient to constitute a taking. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978).

Here, it is indisputable that the government has not seized the property of plaintiffs for its own or the public's use. Therefore, Public Law 102–393, § 633 is not a taking without just compensation in violation of the Fifth Amendment, and as such it is respectfully recommended that summary judgment on this issue be granted in favor of defendants.

### G. *Separation of Powers*

Plaintiffs' final allegation is that Congress violated the principles of separation of powers, as delineated in Articles I, II, and III of the Constitution, when it limited the discretion of the BATF by enacting Public Law 102–393, § 633. It is the finding of the undersigned that as a matter of law, no violation of separation of powers exists, and that summary judgment on this ground must be granted in favor of defendants.

The foundation of the separation of powers doctrine is that the Constitution divides the powers of the federal government into three defined categories: legislative, executive, and

judicial. The declared purpose of dividing the powers of government was to secure the preservation of liberty by providing "avenues for the operation of checks on the exercise of governmental power." *Bowsher v. Synar,* 478 U.S. 714, 722, 106 S.Ct. 3181, 3186, 92 L.Ed.2d 583 (1986). The system of separated powers and checks and balances established in the Constitution is regarded as a "self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Metropolitan Washington Airports Authority v. Citizens for Abatement of Aircraft Noise, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2298, 2309, 115 L.Ed.2d 236 (1991) (quoting *Buckley v. Valeo,* 424 U.S. 1, 122, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976)). While the Constitution mandates that each of the three branches of government remain free from control of either of the others, the Framers did not require that each branch must be entirely separate and distinct. *Mistretta v. United States,* 488 U.S. 361, 380, 109 S.Ct. 647, 658, 102 L.Ed.2d 714 (1989). As set forth by Justice Jackson, "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Mistretta,* 488 U.S. at 381, 109 S.Ct. at 659 (quoting *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (concurring op.)).

Nevertheless, the legislative branch of government maintains constitutional powers that are more extensive and less susceptible to precise limits than either of the other two branches. In order to "forestall the danger of encroachment beyond the legislative sphere the Constitution imposes two basic and related constraints on the Congress." *Metropolitan Washington Airports Authority,* —— U.S. at ——, 111 S.Ct. at 2310. First, it may not "invest itself or its Members with either executive power or judicial power." —— U.S. at ——, 111 S.Ct. at 2310 (quoting *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624 (1928)). Second, when Congress exercises its legislative power, it must follow the "single, finely wrought and ex-

haustively considered" procedures specified in Article I. *INS v. Chadha,* 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983).

The first constraint on Congress is illustrated in *Bowsher v. Synar,* 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), wherein the Court concluded that the Comptroller General's role in exercising executive functions was violative of the doctrine of separation of powers because Congress may not retain the powers of removal over an officer performing executive functions. The second congressional constraint is set forth in *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), which determined that Congress may not exercise legislative power without following the bicameral and presentment procedures specified in Article I.

In this case, Public Law 102–393, § 633 does not violate either of the two constitutional limits of Congress' powers as enunciated in *Bowsher* and *Chadha.* Congress has neither retained the power of removal or appointment over an officer exercising executive functions, nor has it attempted to exercise its legislative power outside the boundaries of Article I. Congress legislatively delegated the authority to issue COLAs to the ATF. The Constitution requires Congress to articulate policies and standards that would serve to confine the discretion of administrative agencies like BATF to whom Congress has delegated power. *Mistretta,* 488 U.S. at 369, 109 S.Ct. at 653. The statute here is a proper exercise of Congress' responsibility to define the boundaries of the agency's authority. Clearly, Congress had the power to define further its delegation of authority to BATF, as it did legislatively in Public Law 102–393, § 633.

Therefore, since Congress implemented its directive modifying BATF's delegated authority to issue COLAs in accordance with the procedures set out in Article I, it did not violate the separation of powers principle by enacting Public Law 102–393, § 633. It is respectfully recommended that summary judgment on this claim be granted in favor of defendants.

## CONCLUSION

For the reasons stated above, it is respectfully recommended that summary judgment

in favor of the plaintiff be granted on the basis that Public Law 102–393, § 633 violates the First Amendment of the Constitution. On the claims alleging violations of the Equal Protection Clause, Due Process Clause, Takings Clause, Bill of Attainder Clause, and Separation of Powers doctrine, it is respectfully recommended that summary judgment be granted in favor of defendants.

Although this Court has found that Public Law 102–393, § 633 violates the First Amendment for the reasons discussed above, this decision should not be read as either condoning or endorsing plaintiffs' choice of name for their product Crazy Horse Malt Liquor. The Court can well appreciate that the use of the name of a revered Native American leader, who preached sobriety and resisted exploitation under the hand of the United States government, is offensive and may be viewed as an exploitation of Native Americans throughout this country. The choice may be particularly insensitive given the ample documentation of alcohol abuse and its destructive results among Native Americans. Nevertheless, a price we pay in this country for ordered liberty is that we are often exposed to that which is offensive to some, perhaps even to many. It is from our exposure to all that is different that we best learn to address it, change it, and sometimes tolerate and appreciate it. "Freedom of speech may best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949) (Douglas, J.). To those who are offended by the use of the Crazy Horse Malt Liquor label, the directive of the district court in *Sambo's of Ohio, Inc. v. Toledo*, 466 F.Supp. 177, 180 (N.D.Ohio 1979) is particularly apt:

> If they are offended by the word [Crazy Horse] not only can they refuse to patronize the plaintiffs, but they, too, can erect signs, carry placards, or publish advertisements designed to persuade others to refuse to patronize the plaintiffs. That is what freedom of speech is all about. One cannot have freedom of speech for himself if it can be denied to others, nor is speech free if only innocuous utterances are per-

mitted.... It would be selling our birthright for a mess of pottage to hold that because language is offensive and distasteful even to a majority of the public, a legislative body may forbid its use.

It is in this spirit that the undersigned respectfully recommends that Public Law 102–393, § 633 be declared an unconstitutional violation of the First Amendment.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

SO ORDERED.