United States Court of Appeals,

Fifth Circuit.

No. 93-1703.

MD II ENTERTAINMENT, INC., d/b/a The Fare West, Plaintiff-Appellee-Cross-Appellant,

v.

CITY OF DALLAS, TEXAS, et al., Defendants-Appellants-Cross-Appellees.

Aug. 11, 1994.

Appeals from the United States District Court for the Northern District of Texas.

Before WISDOM and JONES, Circuit Judges, and COBB,[*] District Judge.

WISDOM, Circuit Judge:

In this case we must decide whether the restrictions imposed by the defendant/appellant, the City of Dallas ("the City"), on the advertising of "Class D Dance Halls" are consistent with the First and Fourteenth Amendments. We conclude, as did the district court, that the restrictions imposed by the City are not allowable under the First Amendment, and accordingly, we AFFIRM the district court's summary judgment for the plaintiff. We also AFFIRM the district court's judgment on the plaintiff's cross-appeal.

I.

On January 22, 1992, the City amended its Dance Halls Ordinance to create a new category of business called a "Class D Dance Hall". The ordinance defined a Class D Dance Hall as any place

---

[*]District Judge of the Eastern District of Texas, sitting by designation.

(A) where dancing is permitted one day a week or more by a person in a state of semi-nudity or simulated nudity; or

(B) that is advertised either on or off the premises:

(i) as topless;

(ii) as a gentleman's club, bar, or saloon;

(iii) as adult entertainment;

(iv) as x-rated; or

(v) by any other term calculated to attract patrons with nudity, semi-nudity, or simulated nudity.[1]

The ordinance defined "semi-nudity" as "a state of dress in which clothing covers no more than the genitals, pubic region, buttocks, and areolae of the female breast, as well as parts of the body covered by supporting straps or devices".[2] The ordinance defined "simulated nudity" as "a state of dress in which any device or covering, exposed to view, is worn that simulates any part of the genitals, buttocks, pubic region, or areolae of the female breast".[3]

The amended Class D Dance Halls ordinance imposed zoning restrictions on Class D Dance Halls. Specifically, the ordinance provided that no Class D Dance Hall may operate within 1,000 feet of a church, school, residential area, park, or another Class D Dance Hall.[4] After the amendment to the ordinance, every single operating business in the City of Dallas that fitted the definition

---

[1]Dallas City Code, ch. 14, § 14-1(5).

[2]*Id.* § 14-1(14).

[3]*Id.* § 14-1(15).

[4]*Id.* § 14-2.2.

of a Class D Dance Hall was in violation of the zoning restrictions.

Plaintiff/appellee MD II Entertainment, Inc. ("MD II") owns and operates The Fare West, a club in Dallas that features topless dancing. By having its dancers dance in a state of "simulated nudity",[5] MD II avoided the strictures of the City's Sexually Oriented Business Ordinance.[6] MD II did, however, fall within the purview of the City's Class D Dance Halls ordinance. MD II has a Class D Dance Hall license, but The Fare West in its present location violates the zoning restrictions of § 14-2.2 of the ordinance. Accordingly, the ordinance requires The Fare West, as a "nonconforming use", to cease operation as a Class D Dance Hall.

MD II challenged the ordinance in the district court. On cross-motions for summary judgment, the district court upheld most of the ordinance.[7] It upheld the zoning distance requirements of § 14-2.2 and rejected the plaintiffs' vagueness and overbreadth challenges to the definition of "simulated nudity" in § 14-1(15). The district court struck down two provisions: (1) section 14-1(5)(B), which imposes the zoning requirements of § 14-2.2 on

---

[5]MD II's female dancers wear opaque latex pasties that cover the areolae of their breasts. The district court noted that these pasties "are clearly designed to simulate female areolae". The dancers also wear opaque bikini bottoms. There is no disagreement that this mode of attire fits the ordinance's definition of "simulated nudity".

[6]The Sexually Oriented Business ordinance defines "nudity" in a fashion that excludes "semi-nudity" or "simulated nudity".

[7]*MD II Entertainment, Inc. v. City of Dallas,* 1993 WL 227774 (N.D.Tex. Apr. 15, 1993).

3

businesses only because of terms used in their advertising, and (2) section 14-3(a), which allows the Chief of Police to deny an application for a Class D Dance Hall license to applicants who are not of "good moral character" without providing any standards to protect against an arbitrary denial.  The City has appealed to this court only the striking down of § 14-1(5)(B).[8]  The district court also ruled that MD II has no standing to assert a state-law sex discrimination challenge to the ordinance.  MD II cross-appeals from this ruling.  Finally, the district court also awarded MD II its attorneys' fees as a prevailing party, a ruling the City challenges on this appeal.

## II.

We begin by reviewing the district court's summary judgment holding that § 14-1(5)(B) is unconstitutional.  Our standard of review is *de novo*.  There are no disputed issues of fact, so we need only decide whether the district court correctly ruled that MD II was entitled to judgment as a matter of law.

*A. The Ordinance Regulates Speech*

The city's first argument is that § 14-1(5)(B) is merely a

---

[8]Only the constitutionality of § 14-1(5)(B) is before us. The City conceded at oral argument that MD II now has clothed its dancers sufficiently to remove it from the purview of § 14-1(5)(A), but has not altered its advertising.  The district court's opinion noted that "MDII ... uses off-premises newspaper and radio advertising which frequently employs the terms "gentleman's entertainment,' "gentleman's party complex,' and "gentleman's club' to attract customers.  MDII also uses on-premises signs to advertise its business which include the term "topless' to describe the entertainment which MDII offers." 1993 WL 227774, at *11 n. 15.  Accordingly, there is still a live controversy between the parties, but only so far as § 14-1(5)(B) is involved.

4

definition that does not regulate speech at all, and accordingly is beyond First Amendment scrutiny. This argument exalts form over substance. Under the ordinance, businesses which use certain terms in their advertising must close and relocate, while businesses which do not use those terms are unaffected. The connection is one of cause and effect: the City says MD II must close The Fare West *because of* the advertising it employs. Section 14-1(5)(B) plainly is a regulation of speech.

*B. Which Test Applies?*

Section 14-1(5)(B) of the ordinance is a content-based restriction on commercial advertising.[9] The forbidden content is stated expressly in the terms of the ordinance. Accordingly, until very recently it would have been clear that the appropriate test was the four-part intermediate scrutiny analysis laid out by the Supreme Court in *Central Hudson Gas & Electric Corp. v. Public*

---

[9]Because § 14-1(5)(B) regulates the content of protected commercial speech, we need not evaluate it under the "secondary effects" test often applied to content-neutral regulations of nonobscene erotic entertainment. *See City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), *reh'g denied,* 475 U.S. 1132, 106 S.Ct. 1663, 90 L.Ed.2d 205 (1986); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), *reh'g denied,* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976); *cf. TK's Video, Inc. v. Denton County, Tex.,* 24 F.3d 705 (5th Cir.1994). We do consider some of the "secondary effects" the City alleges, however, as relevant to the question whether there is a "substantial governmental interest" served by the ordinance. *See infra* part II.C.2.

Similarly, because § 14-1(5)(B) regulates MD II's *advertising,* rather than regulating the attire of the dancers at The Fare West, we need not evaluate the restriction under the approach of *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion).

*Service Commission.*[10]  More recent cases, however, have questioned the continued vitality of *Central Hudson* as it applies to content-based restrictions on commercial speech.  Our resolution of this case renders it unnecessary to decide which standard applies, but we note the existence of the debate to inform counsel and future panels.

In *R.A.V. v. City of St. Paul, Minnesota,*[11] the Supreme Court subjected a content-based restriction of "fighting words" to strict scrutiny.  The strict scrutiny test requires a regulation of speech to be narrowly tailored to a compelling governmental interest.  The Supreme Court in *R.A.V.* concluded that the municipal ordinance at issue failed the strict scrutiny test, and the Court struck the ordinance down.  Because commercial speech traditionally has received greater First Amendment protection than "fighting words",[12] some district courts have concluded that the strict scrutiny standard must apply to content-based restrictions of commercial speech as well.[13]  Of course, it is undisputed that *Central Hudson* continues to govern content-neutral regulations of commercial

---

[10]447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

[11]505 U.S. ----, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992).

[12]*See R.A.V.,* 505 U.S. at ----, 112 S.Ct. at 2564-65, 120 L.Ed.2d at 343-44 (Stevens, J., concurring in the judgment); *see also* Rodney A. Smolla, *Information, Imagery, and the First Amendment:  A Case for Expansive Protection of Commercial Speech,* 71 Tex.L.Rev. 777, 791 & nn. 56-57 (1993).

[13]*Citizens United for Free Speech II v. Long Beach Township Bd. of Comm'rs,* 802 F.Supp. 1223, 1232 (D.N.J.1992); *cf. Hornell Brewing Co., Inc. v. Brady,* 819 F.Supp. 1227 (E.D.N.Y.1993) (applying both the *Central Hudson* and *R.A.V.* tests without deciding which is required).

speech.[14]

Because we conclude that, on the record before us, § 14-1(5)(B) does not survive the intermediate scrutiny of *Central Hudson,* we need not consider whether that test, rather than the strict scrutiny of *R.A.V.,* must guide our inquiry.[15]

*C. Applying the Central Hudson Factors*

*Central Hudson* laid out a four-part test for evaluating a restriction of commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.[16]

1. Legality and Truthfulness of the Communication

This issue is not contested. MD II's advertising is related to lawful activity and is not misleading.

2. The Governmental Interest

This part of *Central Hudson* requires us to "identify with care the interests the [City] itself asserts" for the restriction on speech; we may not "supplant the precise interests put forward by

---

[14]*See, e.g., Ibanez v. Florida Dep't of Business & Professional Regulation, Bd. of Accountancy,* --- U.S. ----, 114 S.Ct. 2084, --- L.Ed.2d ---- (1994); *United States v. Edge Broadcasting Co.,* 509 U.S. ----, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993); *Joe Conte Toyota, Inc. v. Louisiana Motor Vehicle Comm'n,* 24 F.3d 754 (5th Cir.1994).

[15]*See Hornell Brewing,* 819 F.Supp. at 1228 n. 1.

[16]*Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351.

7

the [City] with other suppositions".[17]  The chief interest the City asserts to justify its regulation focuses on the deleterious effects topless bars have on the surrounding community.  There is a correlation between the presence of topless dancing establishments, depressed property values, and increased crime. The City in formulating its ordinance relied on studies finding these correlations to exist.  The district court relied on just these effects in upholding the location restrictions contained in § 14-2.2 of the Class D Dance Halls ordinance.  MD II gives us no cause to question the validity and importance of the governmental interest in preserving property values and deterring crime.

3. Direct Advancement of the Governmental Interest

This is the most difficult part of the *Central Hudson* test for the City.  The Supreme Court has repeatedly emphasized the substantial burden this requirement places on the proponent of a restriction on commercial speech.[18]  The burden is on the City to show that its restrictions on MD II's advertising "will in fact alleviate ... to a material degree"[19] the harms identified above. "[T]he regulation may not be sustained if it provides only ineffective or remote support for the government's purpose".[20]

---

[17]*Edenfield v. Fane,* 507 U.S. ----, ----, 113 S.Ct. 1792, 1798, 123 L.Ed.2d 543, 553 (1993).

[18]*See Ibanez,* --- U.S. at ----, 114 S.Ct. at 2088-89, --- L.Ed.2d at ----, and cases collected therein.

[19]*Fane,* 507 U.S. at ----, 113 S.Ct. at 1800, 123 L.Ed.2d at 555.

[20]*Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350.

The district court found that "the city has failed to show that its regulation of Plaintiff's use of the term "gentleman's club' in any way furthers its stated interest" in preserving property values or reducing crime. "[T]he city has made no finding", the district court continued, "that advertising that employs the term "gentleman's club' produces the deleterious effects which the city seeks to curb". The City has not on this appeal persuaded us that the district court's findings were incorrect. In formulating its ordinance, the city relied on no studies showing a link between *advertising* and property values or crime.[21] We have no doubt that the interests the city seeks to protect merit protection, but like the district court, we are

---

[21]*See Fane,* 507 U.S. at ----, 113 S.Ct. at 1800, 123 L.Ed.2d at 555.

> After the district court granted summary judgment for MD II, the City submitted a motion for reconsideration. Attached to the City's motion was the affidavit of James Moncrief, an employee of a real estate consulting firm. Moncrief's affidavit for the first time asserted a link between advertising and depressed property values, and attached a one-page "asset performance monitor" report. The district court, however, refused to consider the new evidence and denied the city's motion. Thus, Moncrief's affidavit is not properly part of the record before this Court. The district court also ruled that "even if admitted, this [new] evidence would not be sufficient to alter the Court's decision ...". We note for the sake of completeness that the "asset performance monitor" provides decidedly mixed support for the City's argument, because it shows a *higher* property value and revenue growth rate for the area around MD II's property than for "comparable properties". *Cf. Fane,* 507 U.S. at ----, 113 S.Ct. at 1801, 123 L.Ed.2d at 556, rejecting affidavit "which contains nothing more than a series of conclusory statements that add little if anything to the Board's original statement of its justifications". In any event, Moncrief's affidavit (dated July 1, 1993) plainly was not considered by the City when it amended the Dance Halls Ordinance on January 22, 1992.

9

unable to conclude on this record that those interests are served by banning the advertising prohibited by the ordinance. This factor weighs in favor of affirming the district court.

## 4. Narrow Tailoring

Finally, *Central Hudson* requires that a regulation of commercial speech "extend only as far as the interest it serves".[22] In this respect, too, the ordinance is deficient. Section 14-1(5)(B)(v) is particularly broad, forbidding the use of any "term calculated to attract patrons with nudity, semi-nudity, or simulated nudity". The City conceded at oral argument that the literal wording of this provision reaches the advertising of events that have never been shown to harm property values or promote crime.[23] The City has put no evidence in the record that forbidding the use of any "term calculated to attract patrons with nudity, semi-nudity, or simulated nudity" in commercial advertising is narrowly tailored to prevent the erosion of property values or reduce crime rates. Therefore, this factor also supports the district court's judgment.

On balance, we conclude that application of the *Central Hudson* factors supports affirmance of the district court. There has been a failure of proof on this record.[24] Because the burden of

---

[22]*Central Hudson,* 447 U.S. at 565, 100 S.Ct. at 2350.

[23]In response to a question from the panel, the City's attorney acknowledged that advertising of "regular performances" of the musical *Oh! Calcutta* would fall within the prohibition in § 14-1(5)(B).

[24]*Cf. Ibanez,* --- U.S. at ----, 114 S.Ct. at 2091, --- L.Ed.2d at ---- ("We have never sustained restrictions on

10

justifying its speech regulation is on the City, the district court's summary judgment for the plaintiff was correct.

Because we uphold the district court's summary judgment for the plaintiff, we reject the City's challenge to the district court's award of attorneys' fees to MD II.

### III.

We turn next to MD II's cross-appeal. MD II attempted in the district court to assert a state-law sex-discrimination challenge to § 14-1(14) and (15) of the ordinance. MD II argued that the definitions contained in those sections define "semi-nudity" and "simulated nudity" differently for males and females. Wearing an opaque covering designed to simulate the areolae of the female breast constitutes "simulated nudity", but the same definition does not apply to the male breast.[25]

The district court ruled that MD II lacked standing to assert a sex-discrimination challenge. Although the district court acknowledged the existence of Article III standing, it rejected MD II's standing under the prudential rules of *Warth v. Seldin.*[26] Specifically, the district court ruled that MD II may not rely on *jus tertii*—the rights of its employees to be free from sex

---

constitutionally protected speech based on a record so bare as the one on which the Board relies here.").

[25]*Cf. SDJ, Inc. v. City of Houston,* 837 F.2d 1268, 1279-80 (5th Cir.), *reh'g denied,* 841 F.2d 107 (5th Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989), rejecting a similar sex-discrimination challenge against a sexually oriented business ordinance.

[26]422 U.S. 490, 499-502, 95 S.Ct. 2197, 2205-2207, 45 L.Ed.2d 343 (1975).

discrimination.[27]  We review a district court's rulings on standing to sue *de novo.*[28]

Article I, section 3a of the Texas Constitution provides:

> Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin.  This amendment is self-operative.

This provision obviously protects MD II's dancers, not MD II itself, against sex discrimination.  None of MD II's dancers have joined as plaintiffs in this lawsuit, however.  MD II gives us no reason to think that there is any practical obstacle to its dancers asserting their own rights to freedom from sex discrimination if they wish to do so.  Granting standing to MD II may, however, result in the unnecessary litigation of a question those parties most immediately affected may not dispute.[29]  Accordingly, we see no error in the district court's ruling that prudential considerations prevent MD II from litigating its dancers' rights.

MD II's reliance on *SDJ, Inc. v. City of Houston*[30] is misplaced.  Although it is true that we addressed the merits of a

---

[27]"[E]ven when the plaintiff has alleged injury sufficient to meet the "case or controversy' requirement, this Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties".  *Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205 (citations omitted).

[28]*United States v. $38,570 U.S. Currency,* 950 F.2d 1108, 1111 (5th Cir.1992).

[29]*See generally* 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3531.9 (2d ed. 1984 & supp. 1994).

[30]837 F.2d 1268 (5th Cir.), *reh'g denied,* 841 F.2d 107 (5th Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1310, 103 L.Ed.2d 579 (1989).

sex-discrimination challenge brought by the owners of topless clubs in *SDJ,* we did not hold that club owners always must be allowed to raise their dancers' rights. We note also that the sex-discrimination challenge in *SDJ* was unsuccessful, suggesting that MD II likely would lose on the merits even if we did consider its *jus tertii* argument.

IV.

We AFFIRM the district court's judgment in all respects.

EDITH H. JONES, Circuit Judge, concurring:

I concur in the majority opinion in this case with two additional observations. First, one must step back in wonder occasionally and ask, as to some areas of law, what have judges wrought? It makes little practical sense to say that the Fare West has to relocate if it permits certain forms of adult entertainment *but not* if, clothing its "dancers" with minuscule additional amounts of tape, it advertises—truthfully—that the entertainment has not changed. This is a silly consequence of first amendment jurisprudence that results from categorizing "zoning" regulations differently from "content-based" advertising regulations.

Second, the City of Dallas could have avoided this adverse ruling if it had adopted regulations such as that for "simple signs," *SDJ, Inc. v. City of Houston,* 837 F.2d 1268, 1278 (5th Cir.1988), or that upheld in *In re Town of Islip v. Caviglia,* 73 N.Y.2d 544, 540 N.E.2d 215, 542 N.Y.S.2d 139 (1989).

13