**LIBERTY COINS, LLC,
et al., Plaintiffs,**

v.

**David GOODMAN, et al., Defendants.**

Case No. 2:12–cv–998.

United States District Court,
S.D. Ohio,
Eastern Division.

Dec. 5, 2012.

Maurice A. Thompson, Columbus, OH, Curt Carl Hartman, Amelia, OH, for Plaintiffs.

Jennifer S.M. Croskey, Ohio Attorney General, William J. Cole, Columbus, OH, for Defendants.

### *OPINION AND ORDER*

MICHAEL H. WATSON, District Judge.

Liberty Coins, LLC and John Michael Tomaso ("Liberty Coins," "Tomaso," or together, "Plaintiffs") move for a temporary restraining order ("TRO") and preliminary and permanent injunctions, pursuant to Federal Rule of Civil Procedure 65, to enjoin enforcement of the Ohio Precious Metals Dealers Act ("Act"). On November 29, 2012, the Court held a combined temporary restraining order and preliminary injunction hearing. For the following reasons, the Court grants Plaintiffs' request for a preliminary injunction.

## I. FACTS[1]

Tomaso is the owner and operator of Liberty Coins, an Ohio Limited Liability Company with its principal place of business and storefront in Delaware County, Ohio. Liberty Coins buys, sells, and trades silver and gold jewelry, hallmark bars, ingots, numismatics, and other items. Plaintiffs have advertised the business through a number of different means, including store frontage and signs, newspaper advertisements, and the distribution of business cards. The advertisements indicate that Liberty Coins buys, sells, and trades gold and silver, with an emphasis on coins and "scrap."

---

**1.** The facts are uncontested and are taken from Plaintiffs' Verified Complaint and the preliminary injunction hearing.

Ohio has a Precious Metals Dealers Act ("Act"), codified at Ohio Revised Code § 4728.01 *et seq.* The Act states that "no person shall act as a precious metals dealer without first having obtained a license from the division of financial institutions in the department of commerce." Ohio Rev. Code § 4728.02(A). "Precious metals dealer" is defined as:

> a person who is engaged in the business of purchasing articles made of or containing gold, silver, platinum, or other precious metals or jewels of any description *if, in any manner, including any form of advertisement or solicitation of customers, the person holds himself, herself, or itself out to the public as willing to purchase such articles.*

Ohio Rev.Code § 4728.01(A) (emphasis added). The Act contains exemptions for certain purchasers and purchases.

On about August 23, 2012, Brian Landis ("Landis"), the Chief Examiner of the Consumer Finance Division at the Ohio Department of Commerce, received an anonymous letter containing an article from the Delaware Gazette which discussed Tomaso's opposition to a proposed Delaware City law regarding precious metals purchases. Kate Liebers, *Police want regulations for Delaware's secondhand retailers,* DELAWARE GAZETTE, Aug. 22, 2012, JXIII, ECF No. 23–1 at PAGEID # 34446. The article prompted Landis to investigate whether Tomaso was violating the Act, and on August 24, he visited Liberty Coins and took photographs of the store front and inside of the store, specifically noting Tomaso's signage. Landis told Tomaso that Plaintiffs were violating the Act and that Plaintiffs were to respond and/or comply with the Act by September 7, 2012.[2] Plaintiffs did not formally respond to the allegations, nor did Tomaso seek licensure as a precious metals dealer.

On about September 24, 2012, after Plaintiffs failed to respond, Landis transferred the case to the legal department, where it was assigned to Defendant Amanda McCartney ("McCartney"), a Consumer Finance Attorney for the Ohio Department of Commerce, Division of Financial Institutions. On or about October 1, 2012, McCartney sent a letter to Tomaso stating that "Liberty Coins has held itself out to the public as willing to purchase precious metals via signage at the store location,"[3] that, based on this activity, Liberty Coins was in violation of the Act, and that Tomaso had failed to respond to the Division of Financial Institutions' inquiry into the violation. The letter requested production of Liberty Coins' business records within twenty-one days "to demonstrate the amount of precious metal [the] business has purchased from the public over the last twelve (12) months" so that a proper fine could be assessed. The letter further advised that failure to respond might result in a cease and desist order, the imposition of up to a $10,000 fine, and may

---

2. The response deadline was later extended ten days.

3. McCartney elaborated on this statement in her subsequent email response to Tomaso by stating:
> The Division has evidence of:
> • "We Buy Gold" sign in your store window
> • "Buying Gold & Silver" freestanding sign outside your store's door
> • "Newspaper advertisements

> • An 8/22/12 article in the Delaware Gazette (where you are quoted several times) which states your shop purchases precious metals
> • Liberty Coins business card which states "Gold and Silver Scrap, Buy—Sell—Trade"

Oct. 17, 2012 email from Amanda McCartney to John Michael Tomaso, JXII, ECF No. 23–1, PAGEID # 339–40.

reflect negatively on any future application for a license.

On or about October 17, 2012, Tomaso sent an e-mail to McCartney requesting clarification of McCartney's letter and requesting an extension of time to respond to the letter. One of the questions Tomaso asked was whether, under the Act, he could continue to operate his business if he ceased all advertising. McCartney granted the requested extension and stated that "[s]imply ceasing advertising does not eliminate the need for a license" and that "[c]easing precious metals business in its entirety is the only way for (sic) forego the need for a license." McCartney stated in a later email, "[Y]ou cannot buy any gold or silver without a license. You must cease all illegal activities immediately as each violation is subject to a $10,000 fine and criminal sanctions...." In response to those representations, Plaintiffs have ceased virtually all advertising and have completely ceased purchasing non-exempt gold and silver.[4]

Plaintiffs seek a TRO and preliminary and permanent injunction enjoining enforcement of the Act, alleging that the Act violates the First Amendment's protection of commercial speech and is void for vagueness.[5]

## II. STANDARD OF REVIEW

 The Court considers four factors in determining whether to issue a TRO or a preliminary injunction: (1) whether the movant has established a substantial likelihood of success on the merits; (2) whether the movant would suffer irreparable harm in the absence of an injunction; (3) whether an injunction would substantially harm

third parties; and (4) whether an injunction would serve the public interest. *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir.2010). The factors are not prerequisites; rather, they must be balanced. *Capobianco, D.C. v. Summers*, 377 F.3d 559, 561 (6th Cir.2004).

## III. DISCUSSION

### 1. Likelihood of Success on the Merits

Plaintiffs argue they bring both facial and as-applied challenges to the Act, arguing primarily that the Act violates the freedom of speech clause of the First Amendment. Defendants argue Plaintiffs articulated an as-applied challenge only in their reply brief and do not have standing to bring an as-applied challenge.

 "[B]ecause the plaintiffs' claim and the relief that would follow ... reach beyond the particular circumstances of these plaintiffs, the claims that are raised are properly reviewed as facial challenges to the Act." *Discount Tobacco City & Lottery, Inc. v. U.S.*, 674 F.3d 509, 521 (6th Cir.2012) (internal quotation omitted). "To succeed in a typical facial attack, [a plaintiff] would have to establish that no set of circumstances exists under which [the statute] would be valid, or that the statute lacks any plainly legitimate sweep." *Id.* (quotation omitted).

Because the Court finds Plaintiffs are likely to prevail on a facial challenge to the Act, the Court does not consider whether the Act has been unconstitutionally applied to Plaintiffs in particular or whether Plaintiffs have standing to bring such a claim.

---

4. Tomaso admitted at the hearing that he ran one newspaper advertisement after September 7, 2012.

5. Plaintiffs also state the Act provides for warrantless searches without probable cause in violation of the Fourth Amendment but have conceded that argument is not at issue at this stage of the litigation.

## A. Level of Scrutiny

The First Amendment reads in part, "Congress shall **make** no law . . . abridging the freedom of speech. . . ." U.S. Const. Amend. I. The First Amendment is applicable to the states through the Fourteenth Amendment. U.S. Const. Amend. XIV; *Ward v. Polite*, 667 F.3d 727, 732 (6th Cir.2012). Not all abridgment of speech is scrutinized similarly; the Supreme Court has established different tests for different types of regulations and different types of impacted speech.

Content-based regulations restricting speech are subject to strict scrutiny. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Such regulations must be narrowly tailored to promote a compelling government interest and will not stand if a less restrictive alternative is available. *Id.* Such regulations are presumptively invalid. *Id.* at 817, 120 S.Ct. 1878.

Generally, "[c]ommercial speech by its very nature involves commercial transactions, and thus is provided lesser protection by the Constitution than is noncommercial speech." *PHN Motors, LLC v. Medina Twp.*, 498 Fed.Appx. 540, 544 (6th Cir.2012). Content-neutral regulation of commercial speech is therefore analyzed under intermediate scrutiny. "[I]ntermediate scrutiny requires that a restriction on speech be narrowly tailored to further a *substantial* government interest." *PHN Motors, LLC*, 498 Fed.Appx. at 544. The four part test for intermediate scrutiny in commercial speech cases was developed by the Supreme Court in *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm. of New York*, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980); *PHN Motors*, 498 Fed.Appx. at 544. "On each point, the government bears the burden of establishing the constitutionality of its regulatory scheme." *Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Cir.2007). The third prong requires the State to prove that the regulation will advance the substantial interest "to a material degree." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (Stevens, Kennedy, Souter, Ginsburg, JJ) (quotation omitted); *Fruchey*, 492 F.3d at 771. "[T]he government must come forward with some quantum of evidence, beyond its own belief in the necessity for regulation, that the harms it seeks to remedy are concrete and that its regulatory regime advances the stated goals." *Fruchey*, 492 F.3d at 771. The third and fourth prongs do not require the restriction to be the least restrictive means to achieve an objective "but only that it must be 'reasonable' and 'not more extensive than necessary.'" *PHN Motors, LLC*, 498 Fed.Appx. at 545 (quoting *Bd. of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 479–80, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989)). In particular, "[t]he fourth step of *Central Hudson* requires a reasonable fit between the legislature's ends and the means chosen to accomplish those ends, a means narrowly tailored to achieve the desired objective." *Lorillard*

*Tobacco Co. v. Reilly,* 533 U.S. 525, 528, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001).

■ Although formulated differently, the commercial speech test is essentially equivalent to the intermediate scrutiny test for content-neutral time, place, and manner restrictions of speech. *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 554, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) ("[W]e developed a framework for analyzing regulations of commercial speech that is 'substantially similar' to the test for time, place, and manner restrictions....").

■ In addition to the *Central Hudson* test and the time, place and manner test, a third form of intermediate scrutiny applies to regulations of *conduct* that merely incidentally impact symbolic speech. Such regulations are subject to a form of intermediate scrutiny set forth in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). In discussing whether a regulation governs conduct, the Supreme Court noted that the regulation in *O'Brien* (which prohibited the mutilation of Selective Service registration certificates) "plainly d[id] not abridge free speech on its face. ..." *Id.* at 375, 88 S.Ct. 1673. Rather, on its face, the Act dealt "with conduct having no connection with speech," and there was nothing "necessarily expressive" about mutilating or destroying a registration card. *Id.* The regulation did "not punish only destruction engaged in for the purpose of expressing views." *Id.* The Supreme Court therefore held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *Id.* at 376, 88 S.Ct. 1673. The test in such situations is whether the regulation is:

within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. 1673.

■ To qualify as a regulation of communicative action governed by *O'Brien,* the State's regulation must be unrelated to expression. *Lorillard,* 533 U.S. at 567, 121 S.Ct. 2404 (holding that requirement that certain advertising be placed more than five feet off the ground should not be analyzed under *O'Brien* because the "height restriction is an attempt to regulate directly the communicative impact of indoor advertising."). *O'Brien* is therefore the test of "the constitutionality of content-neutral regulations of ... general conduct ... that incidentally burden[ ] 'symbolic speech' or 'expressive conduct'...." *See also City of Erie v. Pap's A.M.,* 529 U.S. 277, 289, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Richland Bookmart, Inc. v. Knox Cnty., Tennessee,* 555 F.3d 512, 521 (6th Cir.2009). The United States Court of Appeals for the Sixth Circuit has recognized that the *O'Brien* test is also interchangeable with the time, place, and manner test. *Richland Bookmart, Inc.,* 555 F.3d at 521–22.

■ Here, the parties disagree as to which standard of scrutiny applies. Plaintiffs argue that the Act is content-based, and therefore under *Sorrell v. IMS Health Inc.,* a "heightened" level of scrutiny applies. But, they argue that even if the Act is not considered content-based, it is a burden on commercial speech and fails the *Central Hudson* test. Defendants argue the Act governs conduct, not speech, and therefore should be reviewed under

*O'Brien.* For the following reasons, the Court finds *Central Hudson* is the appropriate standard.

 First, the Court turns to whether the Act should be reviewed as a regulation of commercial speech under *Central Hudson* or whether it is a regulation of conduct with an expressive element that should be analyzed under *O'Brien.* "Interpretation of a statute begins with the statute's plain language, and if such language is clear and unambiguous, the Court will usually proceed no further." *See also Discount Tobacco City & Lottery, Inc. v. U.S.,* 674 F.3d 509, 549 (6th Cir. 2012); *United States v. Bailey,* 228 F.3d 637, 638 (6th Cir.2000). "Every word in the statute is presumed to have meaning, and we must give effect to all the words to avoid an interpretation which would render words superfluous or redundant." *Riley v. Kurtz,* 361 F.3d 906, 913 (6th Cir.2004) (internal quotation omitted).

The Act is not a text-book regulation of commercial speech. On its face, § 4728.02(A) states that no one may "act" as a precious metals dealer without first obtaining a license; it does not prohibit one from speaking without a license. Therefore, Defendants' contention that the Act regulates conduct rather than speech may seem appealing at first blush.

Upon closer consideration, however, Defendants' argument fails. First, Defendants' argument rests on their assertion that the Act makes it illegal to purchase precious metals without a license, but that argument lacks merit.[6] In support, Defendants argue that the Act's definition of precious metals dealers means a license is required for anyone who purchases precious metals if they hold themselves out to the public as willing to do so. They further aver that engaging in a transaction to buy precious metals is holding one's self out as willing to purchase precious metals. Therefore, the act of purchasing precious metals triggers the need for a license.

Defendants' argument ignores the plain language of the Act. As mentioned above, the Act defines a precious metals dealer as one "who is engaged in the business of purchasing articles ... *if, in any manner,* ... *the person holds himself, herself, or itself out to the public as willing to purchase such articles.*" Ohio Rev.Code § 4728.01(A) (emphasis added). The word "if," following the phrase "engaged in the business of purchasing articles" signifies that the mere purchase of such articles is not enough to make one a precious metals dealer; something more is required. *That something more is the "holding out."* If "engaging in the purchase" could be a form of holding out, the entire clause after the word "if" would be superfluous. Under Defendants' interpretation, the Act could read that one is a precious metals dealer when one engages in the business of purchasing certain articles if one, in any manner, purchases such articles. Such a reading is nonsensical. Instead, the Act requires a purchaser to hold himself, herself, or itself out as willing to purchase such articles to fall within the definition of "precious metals dealer." A purchaser who holds himself, herself, or itself out necessarily engages in commercial speech.

Having determined that only those who engage in commercial speech meet the definition of precious metals dealers, it follows that only those who engage in commercial speech are "acting" as precious metals dealers such that they are the only ones

---

**6.** Defendants cite the email from McCartney to Tomaso as support, but the email is not evidence of what the Act requires. It is evidence of McCartney's interpretation of the Act.

subject to the licensing requirement. Thus, while the statute purports to regulate conduct in § 4728.02, it only regulates the conduct of those who engage in commercial speech by virtue of the definition in § 4728.01. "To qualify as a regulation of communicative action ... the State's regulation must be unrelated to expression." *Lorillard Tobacco Co.,* 533 U.S. at 567, 121 S.Ct. 2404. Here, engaging in commercial speech is precisely what triggers the licensing requirement, and therefore, the Act is not merely a regulation of conduct amounting to symbolic speech. *See Thompson v. Western States Med. Ctr.,* 535 U.S. 357, 370, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002) (analyzing a law which stated, "as long as pharmacists do not advertise particular compounded drugs, they may sell compounded drugs without first ... obtaining FDA approval. If they advertise their compounded drugs, however, FDA approval is required" under *Central Hudson* and stating that "advertising [was] the trigger for requiring FDA approval...."); *Discount Tobacco City & Lottery, Inc. v. U.S.,* 674 F.3d 509, 531–34 (6th Cir.2012) (applying *Central Hudson* to analyze a portion of the Family Smoking Prevention and Tobacco Control Act which made it illegal to introduce into interstate commerce a modified risk tobacco product when whether something met the definition of a modified risk tobacco product depended on its labeling or other commercial speech); *Fruchey,* 492 F.3d at 772 (holding ordinance that prohibited parking of a vehicle with the purpose of displaying it for sale or advertising implicated first amendment); *MD II Entm't, Inc. v. City of Dallas, Tex.,* 28 F.3d 492, 494 (5th Cir. 1994) (rejecting argument that definitional section of an ordinance was beyond First Amendment scrutiny and stating, "[t]he

connection is one of cause and effect: the City says MD II must close The Fare West *because of* the advertising it employs. Section 14–1(5)(B) plainly is a regulation of speech.").

The Court's conclusion is also supported by the decision of the United States Court of Appeals for the Eleventh Circuit in *Abramson v. Gonzalez,* 949 F.2d 1567 (11th Cir.1992). *Abramson* involved a facial attack on a Florida licensing scheme for psychologists. Florida did not require a license in order to practice psychology, but persons not licensed were prohibited from using certain words in advertising or from holding themselves out by certain titles. "The license granted to those who meet certain educational and professional requirements then, [was] not so much a license to practice as it [was] a license to speak and to advertise." *Id.* at 1573. The Eleventh Circuit found it obvious that the statute restricted speech because under the licensing scheme, anyone could *practice* psychology, but only those with a license could *say* they did so or hold themselves out to the public as doing so. *Id.* at 1574. The Eleventh Circuit found the licensing scheme regulated commercial speech and reviewed it under the intermediate scrutiny test set forth in *Central Hudson. Id.* at 1575.[7] Likewise, the Ohio Act does not make it illegal to purchase precious metals without a license, but only those with a license may hold themselves out to the public as willing to do so.

In sum, the Act is a prohibition of conduct that only applies to persons who engage in commercial speech. Because commercial speech is singled out and directly burdened by the Act, the Court finds *Cen-*

---

**7.** The Eleventh Circuit further held the scheme violated the First Amendment because as long as Florida allowed people to

practice psychology without a license, it must allow them to "say truthful things about their work." *Id.* at 1576.

*tral Hudson* is the proper standard of review.[8]

The Court next considers whether a more exacting level of scrutiny should be applied due to Plaintiffs' contention that the Act is a content-based regulation. Synthesizing the different tests described above, content-based regulation of commercial speech is likely subject to some form of "heightened" scrutiny. *See Sorrell v. IMS Health Inc.,* — U.S. —, 131 S.Ct. 2653, 2664, 180 L.Ed.2d 544 (2011). However, as the Supreme Court stated in *Sorrell,* the outcome of the analysis will likely be the same "whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied." *Id.* at 2667. Notwithstanding *Sorrell,* and without addressing it, the Sixth Circuit has recently stated in an unpublished opinion that "[w]hether regulations on commercial speech are content-based or content-neutral, intermediate scrutiny is applied." *PHN Motors, LLC,* 498 Fed.Appx. at 544. It is thus unclear whether the Sixth Circuit interprets *Sorrell* to require a heightened level of scrutiny for content-based regulations of commercial speech, but as the Act likely fails *Central Hudson* review, it is not a question the Court will address.

## B. Application of *Central Hudson*

Applying the framework to this case, the Court finds Plaintiffs have demonstrated a likelihood of success on the merits.

### 1. Whether the Speech is Protected by the First Amendment

▮▮▮ The first prong is whether the speech is protected by the First Amendment, which means it must concern lawful activity and not be misleading. *Cent. Hudson,* 447 U.S. at 566, 100 S.Ct. 2343.

Defendants argue the speech does not concern lawful activity. They argue the Act makes it illegal to purchase precious metals without a license. Because Plaintiffs are purchasing precious metals without a license, that conduct is illegal. Therefore, Plaintiffs' commercial speech stating a willingness to purchase precious metals does not concern lawful activity. As discussed above, however, the first prong of Defendants' argument is faulty. Because the Act allows persons to purchase precious metals without a license so long as they do not hold themselves out as willing to do so, the commercial speech at issue concerns the underlying conduct of purchasing metals without a license, which is legal.[9]

---

**8.** Additionally, the Court finds the *Central Hudson* analysis applies even though the Act is not a complete ban on advertising but rather places a burden on advertising. *See United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 812, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (stating, "[t]he distinction between laws burdening and laws banning speech is but a matter of degree" and holding a content-based burden on speech to the same strict scrutiny as a content-based ban).

In any event, as stated above, both the *O'Brien* test and the *Central Hudson* test are different forms of intermediate scrutiny. Thus, it is doubtful the result would be any different if the Court applied the *O'Brien* test.

**9.** Plaintiffs state Defendants advance another argument: the State has made it illegal to,

without a license, hold one's self as willing to purchase precious metals. Plaintiffs are holding themselves as willing to purchase precious metals and do not have a license. Therefore, the speech is illegal. The Court does not believe Defendants advance that argument, but to the extent they do, the Court agrees that such an argument is circular. *See Roberts v. Farrell,* 630 F.Supp.2d 242, 249 (D.Conn.2009) ("By this logic, a state would always be insulated from any constitutional challenge to a commercial speech restriction because the plaintiffs would always fail the first prong of *Central Hudson).* A similar argument was rejected in *Byrum v. Landreth* because it "would authorize legislatures to license speech and reduce its consti-

■ Defendants also argue the Act is similar to many attorney-licensing laws. Such laws presumably prohibit unlicensed people from acting as attorneys and also prohibit unlicensed persons from holding themselves out as attorneys. The Court agrees that where the underlying activity is illegal, commercial speech "related to" such illegal activity does not enjoy First Amendment protection. *See, e.g., Campbell v. Robb,* 162 Fed.Appx. 460, 469 (6th Cir.2006) (finding that because it was illegal to discriminate in housing, discriminatory statements made from prospective landlord to prospective tenant, while commercial in nature, were "related to illegal activity" and failed the first prong of *Central Hudson); Office of Prof. Reg. v. McElroy,* 175 Vt. 507, 824 A.2d 567 (2003) (holding that statute that prohibited advertising status as real estate broker without a license is not a First Amendment violation where statute also prohibited negotiating sale of real estate without a license). But here, the analogy is flawed. The equivalent would be requiring a license for anyone who buys precious metals. In that instance, if one did not have a license, holding one's self out as able to buy precious metals would be misleading and would concern illegal activity. But, as discussed above, the Act does not make it illegal to buy precious metals without a license. Therefore, advertising that one purchases precious metals does not concern illegal activity.

Moreover, the speech is not misleading. Tomaso testified at the hearing that he has never held himself or Liberty Coins out as a State-licensed purchaser of precious metals, and Defendants have not produced evidence that Plaintiffs misleadingly advertise themselves as licensed precious metals dealers.

Plaintiffs are therefore likely to show the expression is protected by the First Amendment as it concerns lawful activity and is not misleading. As such, Plaintiffs are likely to satisfy the first *Central Hudson* prong.

### 2. Substantial Governmental Interest

■ Under the second prong, the Court considers whether the State's asserted interest is substantial. The Act itself does not contain legislative history stating the asserted State interests, but Defendants aver the State has an interest in protecting the public and consumers from theft, fraud, money laundering, fencing, and even terrorism. Plaintiffs concede that such interests are substantial, and the Court agrees.

### 3. Direct and Material Advancement of Interests

■ As to the third prong, the burden is on Defendants to show the restrictions on "advertising 'will in fact alleviate . . . to a material degree' the harms identified above." *MD II,* 28 F.3d at 496 (quoting *Edenfield v. Fane,* 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)).[10] Defendants' sole argument in briefing with respect to the third prong is the conclusory statement that "the PMDA directly advances [the substantial] interests through licensure that enables regular and effective State oversight." Resp. 15, ECF No. 14. Defendants provide no support for that conclusion apart from incorrectly asserting that the law prevents fraud, money laundering, theft, and terrorism "by requiring those who wish to engage in the business

tutional protection by means of the licensing alone." 566 F.3d 442, 447 (5th Cir.2009).

**10.** By "advertising," the Court refers to any commercial speech that constitutes "holding out" under the Act.

of buying from the public gold, silver, and other precious metals to be licensed." Resp. 14, ECF No. 14. The Court has already shown that statement is factually incorrect. When asked at the hearing, neither McCartney nor Landis were aware of any crime statistics maintained by the Department of Commerce related to precious metals dealers, and no one testified as to how *commercial speech*, as opposed to dealing in precious metals, contributes to theft, money laundering, terrorism,[11] or affects any other State interest.

Landis did testify that those licensed under the Act are required to report to the local police daily regarding the purchases of precious metals made that day and that licensees must retain purchased articles of precious metals for five days before reselling them, in order to give local police time to determine whether any of the articles are stolen. *See also* Ohio Rev.Code §§ 4728.07, 4728.09(A). Those requirements could arguably make a licensee more wary about purchasing potentially stolen items and could help police recover stolen items before they are melted for their precious metal content or resold. Thus, if the licensing requirement applied to all those who purchased precious metals, Defendants may have an argument that it directly and materially advances the State's interest in preventing theft. But, as shown above, the Act does not require all those purchasing precious metals to be licensed, despite the fact that Defendants admit "the legitimate State interest is the same regardless of the amount of precious metals purchased from the public and regardless of whether the person advertises or solicits that he is willing to purchase such articles." Pl. Ex., ECF No. 23–2, PAGEID # 364. Subjecting only those who engage in commercial speech to the licensing requirement, and therefore the record keeping and retention requirements, at best indirectly advances the State's interests. Defendants have not presented evidence as to whether the licensing requirement materially advances their goals.

In sum, Defendants have not produced evidence demonstrating how holding one's self out as willing to purchase precious metals contributes to the evils the State seeks to prevent, either through studies, statistics, crime reports, or otherwise.[12] Moreover, Defendants have not shown how requiring a license only for purchasers of precious metals who engage in commercial speech directly and materially advances those interests. Plaintiffs have therefore shown a likelihood of success on the third *Central Hudson* prong. *See MD II*, 28 F.3d at 496 ("We have no doubt that the interests the city seeks to protect merit protection, but ... we are unable to conclude on this record that those interests are served by banning the advertising prohibited by the ordinance.").

11. Counsel are cautioned that terrorism is far too serious an issue to be loosely invoked without substantiating evidence. Bombast masquerading as legal analysis or authority will fall on deaf ears in this Court.

12. Defendants ask the Court to take judicial notice of various newspaper articles, and the Court will take judicial notice only of the publication of the articles. To the extent Defendants argue the articles contain information to show the licensing scheme is narrowly tailored to directly and materially advance the State's interest, the Court will not take judicial notice of the truth of the matters asserted in the articles. *See* Fed.R.Evid. 201(b) (fact must be generally known within the trial court's territorial jurisdiction or accurately and readily determined from sources whose accuracy cannot reasonably be questioned). For the same reason, the arguments made on page 7 of Defendants' closing argument brief are not supported by any admissible evidence. In addition, the arguments do not show how a regulation that applies only to those who engage in commercial speech furthers any State interest.

#### 4. Narrowly Drawn

██ Plaintiffs are also likely to show the Act is not narrowly drawn as there is not a reasonable fit between the regulation and the asserted State's interests. Moreover, Plaintiffs are likely to show the State could achieve its interests by regulating the actions of all those who buy precious metals, without regard to speech. *Western States*, 535 U.S. at 371, 122 S.Ct. 1497 ("If the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so.")

Under the Act, myriad types of transactions are exempted. The Act does not apply to transactions where the buyer and seller deal in precious metals or hold themselves out as particularly knowledgeable or skillful. Ohio Rev.Code § 4728.11(A). Persons licensed to make loans under Ohio Revised Code Sections 1321.01 to 1321.19 and persons registered under Sections 1321.51 to 1321.60 are exempted. *Id.* § 4728.11(B). National banks, state banks, credit unions, and savings and loan associations are exempted. *Id.* § 4728.11(C). Certain purchases by holders of salvage motor vehicle dealers' licenses are exempt. *Id.* § 4728.11(D). Certain purchases of silverware and jewelry are exempt. *Id.* § 4728.11(E). Purchases of gold coins for their numismatic value, as opposed to their content of precious metal, are exempt. *Id.* § 4728.11(F). Purchases made under the supervision of a probate court, and any purchases made by licensed pawnbrokers are exempt. *Id.* § 4728.11(G, H).

The breadth and number of exemptions undercuts Defendants' argument that the licensing scheme is narrowly tailored to protect against theft, fraud, terrorism, or any other State interest. Persons exempted under subsections (E) and (F) of § 4728.11 are still held to certain record keeping requirements, which arguably directly advance the State's interest in detecting theft. Notably, those record keeping requirements suffice to further the State's interests without placing limits on speech, in contrast to the licensing provision in the Act. Continuing to regulate the conduct of persons exempt from the license requirement demonstrates that the actual requirement of obtaining a license is not narrowly tailored to those ends. Rather, if any part of the Act demonstrates a reasonable fit with the State's interests, it is the provisions directly regulating conduct, not the license requirement. Defendants have not shown that forcing those who engage in commercial speech to obtain a license is a reasonable fit with the State's goals when it appears the State could regulate their conduct the same way persons exempt under (E) and (F) are regulated (i.e. in a way that does not burden commercial speech).

Because the State can achieve its interests by directly regulating the purchase of precious metals, the restriction on commercial speech is more extensive than necessary. The State has not shown that there is a fit between its interests and the regulation of commercial speech. Based on the evidence presented thus far, Plaintiffs are therefore likely to meet the fourth *Central Hudson* prong and show the Act is not sufficiently narrowly tailored to withstand intermediate scrutiny under *Central Hudson.*[13]

### 2. Remaining Preliminary Injunction Factors

#### A. Irreparable Harm

██ Defendants argue Plaintiffs cannot show irreparable harm because they

---

**13.** The Court need not decide whether Plaintiffs are likely to prevail on the merits of their vagueness argument as they are likely to prevail on their First Amendment argument.

have no right to engage in the business of buying precious metals without a license. Additionally, Defendants contend Plaintiffs can continue to buy exempt items such as gold coins, which constitutes approximately 62% of Plaintiffs' business, without a license. Finally, Defendants assert Plaintiffs can simply apply for a license to enable them to purchase precious metals.

Defendants' first argument again rests on the premise that the Act prohibits the buying of precious metals without a license. As Plaintiffs are likely to show the Act only prohibits the unlicensed buying of precious metals when commercial speech is involved, Defendants' argument cannot stand. Under the Act, Plaintiffs may purchase precious metals without a license so long as they do not hold themselves out as willing to do so. Therefore, they do have a legal right to engage in the business of buying precious metals.

As to Defendants' second argument, Plaintiffs have presented evidence (through an email from McCartney to Tomaso) that absent a TRO or preliminary injunction, Plaintiffs are unable to advertise for their business of purchasing precious metals without fear of prosecution. JXII at PAGEID # 341–43. Moreover, they are unable to actually purchase precious metals without facing prosecution due to Defendants' incorrect interpretation of the Act. *Id.* at PAGEID # 341. At the hearing, Tomaso testified that he has drastically scaled back his business since Landis' visit by no longer purchasing precious metals except those that fall under an exemption under the Act and by no longer advertising that he buys precious metals. He testified that the foot traffic in Liberty Coins has decreased, and while he could not quantify the decrease, testified that it could mean the difference between staying in business or going out of business.

As to Defendants' third argument, it is of no import that Plaintiffs could apply for a license; Plaintiffs have demonstrated a likelihood of success in showing the licensing scheme is unconstitutional. The Court will not deny a preliminary injunction because Plaintiffs could acquiesce to an unconstitutional requirement.

Further, the October 1 letter from McCartney states that Plaintiffs' continued operation of his business without a license could "reflect negatively upon the good character and fitness the Division must find in order to issue a PMDA license" in the future. JXI at PAGEID # 340.

The inability to operate a business without fear of prosecution, the decreased business, and the fact that continued operation of the business absent a TRO or preliminary injunction could impede Plaintiffs' ability to obtain a license in the future, demonstrates an irreparable harm. Equally important, it has long been the rule that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *G & V Lounge, Inc. v. Mich. Liquor Contr. Comm'n,* 23 F.3d 1071, 1078 (6th Cir.1994) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality)). Thus, Plaintiffs have shown irreparable injury.

**B. Harm to Third Parties**

██ Defendants concede there is no evidence Plaintiffs have engaged in fraud or receiving stolen property, but Defendants argue the potential for fraud or receipt of stolen property exists anytime someone deals in precious metals, such that third parties would be harmed by a preliminary injunction. Moreover, Defendants argue Plaintiffs' commercial speech could mislead potential customers into believing Plaintiffs are licensed precious metals dealers.

Presumably, the potential for fraud or theft exists when anyone buys precious metals, but the Act requires a license only for those who engage in commercial speech. The Court will not deny a preliminary injunction because of a possibility of harm that the Act itself allows to exist for those who do not engage in commercial speech.

Second, Plaintiffs' desired speech is not misleading. Defendants pointed to nothing in Plaintiffs' advertising that suggests Plaintiffs are licensed. As stated above, Tomaso testified that he has never held himself out as a State-licensed dealer.

Defendants have not argued that any statutes of limitations will run on prosecuting Plaintiffs for violations of the Act, should it ultimately be upheld. Moreover, the laws prohibiting receipt of stolen property will still apply to Plaintiffs and anyone who purchases precious metals. *See* Ohio Rev.Code § 2913.51(A) ("no person shall receive, retain, or dispose or property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."). Therefore, Plaintiffs have shown the TRO/preliminary injunction would not harm third parties.

**C. Public Interest**

The public has an interest in protecting the freedom of speech, and "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (quoting *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979)). "Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of in-

formation." *Cent. Hudson*, 447 U.S. at 561, 100 S.Ct. 2343.

Defendants argue the regulation of precious metals dealer activity is in the public interest. That may be. It is not in the public interest, however, to have an Act that unconstitutionally burdens only those who engage in commercial speech. While a TRO or preliminary injunction may, as Defendants suggest, "leav[e] a business that transacts sales of precious metals with consumers without needed State oversight," Resp. 25, ECF No. 14, the Act already provides no oversight for those who do not engage in commercial speech. Plaintiffs have met their burden with respect to this element.

**D. Scope of the Injunction**

Having examined the factors and concluded that each weighs in favor of granting temporary relief, the Court considers the scope of the preliminary injunction. Plaintiffs seek an injunction completely prohibiting Defendants from enforcing the licensing provision of the Act. As Plaintiffs facial attack on the Act is likely to succeed, the Court agrees that a broad preliminary injunction completely prohibiting enforcement of the licensing provision of the Act is warranted.

Accordingly, the Court **ENJOINS** Defendants from enforcing the Ohio Precious Metals Dealers Act.

Defendants have not argued severability. Should the parties agree or Defendants demonstrate that certain provisions of the Act can be enforced while the unconstitutional licensing scheme is enjoined, the Court will consider modifying the injunction. Defendants shall file any motion to modify the injunction based on severability within **THIRTY DAYS.**

Plaintiffs request in one line of their motion that the Court waive the bond re-

quirement. Plaintiffs provide no further argument in support of the request. The language of Rule 65(c) is that the Court may issue a TRO "only if the movant gives security...." Fed.R.Civ.P. 65(c). The Court therefore **ORDERS** Plaintiffs to deposit a cash bond with the Clerk of Court in the amount of $1,000.

Pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, this **PRELIMINARY INJUNCTION ORDER** is binding upon Defendants, their attorneys, and all persons in active concert or participation with them who receive actual notice of the Order whether by personal service or otherwise.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion, ECF No. 7.

**IT IS SO ORDERED.**